RALPH M. LOWENBACH and DENA F. LOWENBACH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lowenbach v. Commissioner
Docket Nos. 17760-81; 11547-83.
United States Tax Court
T.C. Memo 1987-496; 1987 Tax Ct. Memo LEXIS 492; 54 T.C.M. (CCH) 715; T.C.M. (RIA) 87496; September 28, 1987. Jeffrey M. Garrod, for the petitioners. Leslie J. Spiegel and Wendy D. Gardner, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioner's Federal income tax as follows: Docket No.
Year
Deficiency
11760-81
1977
$ 22,816
1978
118,843
1979
16,593
11547-83
1980
10,765
After concessions, [1] the issue for decision is whether petitioners are entitled to claim depreciation deduction and an investment tax credit in connection with Mr. Lowenbach's acquisition of a master sound recording in 1977. *494 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Ralph M. Lowenbach and Dena F. Lowenbach resided in South Orange, New Jersey at the time of the filing of their petitions. Petitioners filed their joint Federal income tax returns (Forms 1040) for the taxable years 1977, 1978, 1979, and 1980 with the Internal Revenue Service Center in Holtsville, New York. They reported their income on the cash basis method of accounting. Petitioner Dena F. Lowenbach is a party in this case solely because she filed a joint tax return with her husband for each of the years in issue. All references to petitioner in the singular will be to petitioner Ralph M. Lowenbach. Petitioner has been a practicing attorney in the State of New Jersey since 1961, specializing in corporate law. He has been a partner in the law firm of Orloff, Lowenbach, Stifelman & Siegel since 1975. During the taxable years in issue, Mrs. Lowenbach was self-employed as a real estate broker. The master sound recording transaction at issue herein was promoted by Lee D. Weisel through *495 Itasca Marketing, Inc. (hereinafter referred to as Itasca). Itasca was incorporated in the State of California on December 17, 1976, and specialized in the sale of phonographic records. At all times pertinent, Lee D. Weisel (Weisel) and Byron Lasky (Lasky) each held a 50-percent interest in Itasca. Festival Distribution, Inc. (hereinafter referred to as Festival), was incorporated in the State of California on February 13, 1976. Festival was involved with the marketing and distribution segment of the record industry. At all times pertinent, Weisel and Laskey each held 25.05-percent interest in Festival and Rick Donovan and Hayward Collins each held a 24.95-percent interest. Weisel was also president of Itasca and vice president and one of the directors of Festival. On or about March 15, 1977, Itasca entered into an agreement with Transworld Music Establishment, an organization located in Schaan, Lichtenstein, to purchase five master sound recordings and with the exclusive option to purchase additional master recordings listed on Schedule "1" of the agreement. [2] The pertinent provisions of the agreement can be summarized as follows: (a) Itasca acquired five master recordings *496 together with all rights and copyright pertaining thereto for the total sum of $ 15,000 and the exclusive option to purchase additional masters through December 31, 1977. (b) All closings were to be handled as follows: At the time a master was selected, Transworld agreed to deliver to Itasca the selected master in commercially satisfactory condition together with a Bill of Sale. The delivery of the master to Itasca's office constituted the closing date of the agreement. (c) The stated purchase price of each master was $ 3,000 payable on the closing date as follows: (1) $ 1,250 in cash and (2) $ 1,750 in the form of a nonrecourse promissory note due December 31, 1977. Each note was to be secured by the master recording under a security agreement to be executed by Itasca at the time of closing. [3]
*497 (d) Title to each master recording was to pass at the time of delivery of the same, subject only to the note and security agreement. (e) In the event the note was not paid, after notice and demand and failure to cure, all rights to the master were to revert to Transworld, effective January 1, 1978. (f) Itasca agreed to use "reasonable efforts" to cause the distribution of masters and that such distribution agreement would be subject to a standard distribution agreement generally in the prescribed form attached thereto. It was "the essence of this agreement that such Distribution Agreement shall require the distributor not to make any payments to the PURCHASER [Itasca] until such time as all payments" to Transworld were completed. (g) In the event that any of the masters sold in excess of 200,000 copies at budget prices and/or discount prices and/or normal retail prices within the United States, then as to such sales in excess of 200,000 copies, Transworld would be entitled to a royalty of 2 percent of the suggested retail price of each recording sold, paid for and not returned. (h) Itasca agreed to render to Transworld within 90 days after the expiration of each calendar *498 semiannual period, a statement of the number of units sold of each master and to render the statements and payments as to the royalty specified when and if due. (i) In the event that Itasca purchased and paid for a minimum of 200 masters on or before December 31, 1977, then Transworld agreed not to re-record such masters for a period of two years from December 31, 1977. [4]
(j) In the event that Itasca purchased all of the masters made available under the agreement by December 31, 1978, then Transworld agreed not to re-record any of the masters for a period of two years from December 31, 1978. (k) In no event would Transworld record or release recordings of any compositions contained on the masters purchased by Itasca under the name of the orchestra used by Itasca on its records made from the masters. Petitioner first learned of the master sound recording venture, as discussed below, from Frank L. Stifelman (hereinafter referred to as Stifelman), a member of his law firm. Petitioner and Stifelman have been friends and law partners or associates for approximately 20 years. From time to time, petitioner *499 asked Stifelman to recommend ways in which petitioner could minimize his tax liabilities. Petitioner did not always accept Stifelman's advice and he generally would make his own investigation of the various investments recommended by Stifelman. Aside from the transaction herein in question, petitioner had previously made investments in various oil and gas ventures and vacant land transactions. Stifelman is a tax lawyer who has both a certified public accounting certificate and an LL.M. degree in taxation from New York University. He graduated from Rutgers School of Business in 1958 with a major in accounting. He then attended Rutgers Law School from which he graduated in 1961. After graduating from law school, he worked for eleven months for a small accounting firm. In May of 1962, Stifelman accepted a clerkship with the Honorable Phillip Foreman on the United States Court of Appeals for the Third Circuit. In August of 1963, his clerkship with Judge Foreman ended and he began working for Arthur Young and Company, a big eight international accounting firm, in the tax department of his New York office. While working for Arthur Young, he obtained his CPA certificate for the *500 State of New Jersey and in April of 1965 he left Arthur Young and began working for a law firm in Newark, New Jersey, which was then known as Hannoch, Weisman, Stern and Besser. Sometime in this period he completed his LL.M. program in tax law. Stifelman became a partner in that firm in 1968. In 1975 he terminated his relationship with that firm and formed the law firm of Orloff, Lowenbach, Stifelman & Siegel, a professional association, of which he and petitioner are still members. In the spring of 1977, Stifelman, while chatting with one of his former law partners, J. Arthur Goldberg, first became aware of the master sound recording venture offered by Itasca. Mr. Goldberg was then a tax partner in the Miami law firm of Fine, Jacobson, Block, Goldberg & Semet. Goldberg's law firm had prepared the 40-page tax opinion, which was Exhibit A of the promotional materials distributed by Itasca to the potential buyers of the master sound recordings and Goldberg put Weisel, the promoter of the venture, in contact with Stifelman. Petitioner's ultimate decision to purchase a master sound recording from Itasca to some extent was based on the fact that J. Arthur Goldberg, also one of *501 petitioner's former law partners, was the original source of contact. Shortly after his discussion with Goldberg, Stifelman was contacted by Weisel and a meeting was arranged at Stifelman's law offices in Newark, New Jersey. At that meeting Weisel gave Stifelman Itasca's 30-page Confidential Record Memorandum dated March 10, 1977, together with the exhibits thereto. This 30-page document contained a description of the proposed investment in a master sound recording to be purchased from Itasca, eight pages of which were devoted to a discussion of the tax aspects. The exhibits to that document included the 40-page tax opinion letter prepared by Goldberg's law firm, and copies of a proposed purchase and sale agreement and a proposed optional distribution agreement with Festival, an affiliate of Itasca. Stifelman and Weisel discussed the nature of the proposed investment. There was also a preliminary discussion regarding the purchase terms, the nature of the agreement, the recourse and the nonrecourse notes, and the possibility of using Festival as the distributor. Lowenbach did not attend this meeting. However, Stifelman relayed the details of his meeting with Weisel to all the *502 partners in his firm. Petitioner indicated an interest in this venture and Stifelman promised to keep him abreast of any subsequent developments. Stifelman also discussed the details of this proposed venture with many of his clients, some of whom also expressed an interest in the master sound recording venture. Itasca's Confidential Record Memorandum stated in part: PURCHASE OF RECORDS INVOLVES A HIGH DEGREE OF RISK. PROSPECTIVE PURCHASES NOT WILLING AND ABLE TO RISK COMPLETE LOSS OF INVESTED CAPITAL MUST NOT CONSIDER A PURCHASE. THE PURCHASE OF RECORDS INVOLVES SUBSTANTIAL TAX RISKS. * * * BECAUSE OF THE SUBSTANTIAL RISKS INVOLVED IN THE PURCHASE OF A RECORD, THE SELLER HAS DETERMINED THAT IT WILL SELL A RECORD ONLY TO INDIVIDUALS WHOSE NET WORTH (EXCLUDING RESIDENCE, FURNISHING AND PERSONAL AUTOMOBILES) IS AT LEAST $ 150,000 ($ 200,000) IN SOUTH CAROLINA) AND SOME PORTION OF WHOSE ANNUAL GROSS INCOME WOULD BE SUBJECT TO FEDERAL INCOME TAX AT A RATE OF 50% OR HIGHER AND WHO CAN BEAR THE ECONOMIC RISK OF A TOTAL LOSS OF HIS CAPITAL. (SEE "RISK FACTORS" AND "WHO MAY PURCHASE A RECORD"). * * * WHO MAY PURCHASE A RECORD
Because of the significant business and *503 tax risks associated with the purchase of a Record, these Records are only offered to sophisticated Purchasers who have a net worth (excluding residence, furnishings, and personal automobiles) of at least One Hundred Fifty Thousand ($ 150,000) Dollars ($ 200,000 in South Carolina) and who have some portion of their annual income subject to Federal Income Tax in the fifty (50%) percent or higher tax bracket during the years 1977 and 1978. Also, they each must have such knowledge and experience in financial and business matters such that they are capable of evaluating the merits and risks involved in the purchase of Records. SALES COMMISSIONS UPON A PURCHASER'S PURCHASE OF A RECORD
The Records are being offered for sale through Private Finders and Participating NASD Licensed Broker-Dealers. Private finders and Participating Broker-Dealers that arrange sale of Records to a Purchaser will receive a sales commission of 10% of the down-payment from the Seller. Coordinating finders who provide assistance to Broker-Dealers may also receive a marketing fee at the rate of 3% of the down-payment from the Seller and marketing expense reimbursement of 2%. Additional finders fees may *504 also be paid by the Seller on a fully disclosed basis. RISK FACTORS
No assurance can be given that a Record will ever be able to provide royalty income to the Purchaser, or that the others entering into the Record Distribution or other related agreements for the exploitation of the Records will meet their obligations thereunder. Each prospective purchaser should carefully consider the following risk factors: RISKS OF THE RECORD BUSINESS
The record business is highly speculative and has historically involved a substantial degree of risk. All the revenues, if any, payable to Purchaser under the Record Distribution Agreement are dependent upon the sale success of the Records, which depends upon factors such as the efforts of the distributor, the willingness of the distributor to expend moneys on advertising and production, free radio airplay, critical reviews and public taste, over which factors the Purchaser will have no control. Even if the Records are critical or artistic successes, there is no assurance that the Records will generate enough sales success to return the Purchase Price of the Record or any profits. In order for the Purchaser to recover his down *505 payment, totaling $ 25,000.00 per Record, the Seller estimates that the proposed distributor will have to sell a minimum of 93,000 copies of each record purchased by the Purchaser. For the Purchaser to pay off the non-recourse loan issued on the purchase of each Record, the Seller estimates that the distributor will have to sell a minimum of 900,000 copies of each Record. There is no assurance that the Records can attain the above levels of sales. The above levels of sales are in excess of the industry norm. RISKS OF RECORD DISTRIBUTION
The Purchase has the option to enter a distribution agreement with Festival Distribution, Inc., a recently formed record distribution company. The Purhaser may, at his option, enter the distribution agreement or find another distributor or distribute his Records in any manner he chooses. The proposed distributor has limited experience in the distribution of new records, i.e. those dependent on free radio airplay for their success. There is, however, no assurance that the distributor will fulfill his obligation under the distribution agreement for the Records. Even if the distributor fulfills his obligation, there is no representation *506 or warranty as to the marketability of the Records or as to their profitability. (See "Distribution Agreement"). The Purchaser is acquiring the worldwide copyright and rights of ownership of each Record he purchases. DISTRIBUTION NOT NECESSARILY PROFITABLE
The unit sales of records are dependent, among other things, upon the ability for a distribution organization to arrange and pay for appropriate advertising and promotion, select proper release dates, and obtain radio station "trade-outs" as well as the willingness of the distributor to expend money to promote the records. Free radio airplay is essential for the success of most records. This process involves competition for radio stations, for available time for advertising, for space in retail record stores, and competition for the consumer's dollar with other, better financed record distributors; and miscalculations with respect to release dates and other contingencies. Sales are also subject to mail delays and customer and retailer returns of records. Nevertheless, sales substantially greater than the industry average must be earned in order for the Purchase to recover his $ 25,000. HIGHLY LEVERAGED INVESTMENT
*507 A substantial portion of the purchase price is represented by a nonrecourse note secured by a mortgage on each Record. If the note is not paid from the Purchaser's royalties from records sold, i.e., from sales revenues, by December 31, 1987, the Purchaser would either have to pay the outstanding balance of principal and interest on the note with other funds or be faced with foreclosure on the mortgage. It is unlikely the Purchaser can generate other funds for this purpose thereby making the note payments almost entirely upon the sales success of the Record. SELLER'S LACK OF EXPERIENCE
Lee D. Weisel, President of the Seller, is selecting the records. Lee D. Weisel has limited experience in the promotion and distribution of phonograph records, but none in the classical music subsector. (See "Management"). LIMITED TRANSFERABILITY OF RECORDS
Prospective Purchasers must be fully aware of the long-term nature of a purchase of the Records, as there is no market in which they may be resold. Consequently, Purchasers will probably not be able to liquidate their Records in the event of an emergency, and the Records are not usually acceptable as collateral for loans. Moreover, *508 should a Purchaser dispose of his Record, taxable income would be realized, to the extent that the Purchaser's share (for tax purposes) of the mortgage debt obligations (plus the other consideration realized upon such disposition) exceeds the Purchaser's tax basis. At the same time, the Purchaser may not receive cash sufficient to pay taxes resulting from such a disposition. (See "Tax Factors") Purchasers of Records will need to bear the economic risks of the purchase for an indefinite period of time. Prospective Purchasers will be required to represent, in writing, that they are purchasing Records for their own account for the long-term only and not with a view toward resale, fractionalization, division or distribution. CONFLICTS OF INTEREST
Itasca Marketing, Inc., Byron H. Lasky and Lee D. Weisel are presently engaged in businesses which compete directly with the proposed business of the Purchaser, i.e., the production and financing of other records. The Sellers reserve the right to sponsor similar Records, companies or entities owning or acquiring certain phonograph records which may compete with the Purchaser's Records for sales dollars. To the extent that these *509 persons have a continuing relationship with competitors of the Purchasers, there is the possibility that there will be conflicts of interests. The Sellers, where they have discretion in such decisions, will attempt in good faith to mitigate such conflicts. (See "Conflicts of Interest"). * * * BUDGET LINE CLASSICAL RECORD SALES
A significant subsector of the record industry is the sale of lines of classical recordings (i.e. symphony and orchestral recordings of compositions by the great masters of music, Bach, Beethoven, Mahler, etc.) * * * The business is highly competitive, with narrow profit margins. In addition, these records may sell in small quantities annually, but for a period many years. Since this subsector is highly competitive, the Purchaser's Records will be completing with records distributed by better financed, more experienced distributors. Therefore, there is no assurance of any record sales or any income therefrom. RISKS OF SELLING RECORDS
The primary risk in marketing records is that of selling records to a retailer who cannot sell them to a consumer and therefore returns them to the distributor, referred to in the record industry as "returns". *510 Peculiar to the "mail order" market is the risk of refusal by a C.O.D. mail order customer and the utilization of the money-back guarantee that accompanies a sale. Excessive returns and inventory can cripple a record distributor. These factors, combined with the cost of radio and television advertising, normal distribution costs, and fierce competition can cause a record to fail to recoup its costs. EVEN THOUGH THE PURCHASER'S RECORDS MAY CONTAIN COMPOSITIONS BY KNOWN COMPOSERS, THERE IS NO ASSURANCE THE RECORDS WILL OBTAIN ANY SALES. Following his initial meeting with Weisel, Stifelman informed Weisel by letter dated June 27, 1977, that he was planning a trip to California on July 14, 1977, to follow through on the master recording transaction. Stifelman was pursuing his investigation on behalf of numerous clients, not just petitioner. Stifelman requested Weisel to have prepared at such time "a form of assignment for review and discussion; the proof that these masters are P copyrighted, brand new, never played before, owned by Itasca (free and clear of all liens and encumbrances and freely transferable);" and "the two appraisals (in a polished form), together with access *511 to the appraisers, etc., etc." Stifelman also indicated he wanted the opportunity to meet with Messrs. Lasky, Collins, Donovan, and others. Weisel responded to Stifelman by letter dated June 30, 1977, and informed him that unfortunately he would be out of town the week of his planned visit, but would arrange a meeting with his partner Byron H. Lasky and the key people at the record company. With this letter Weisel enclosed a copy of the bill of sale from Transworld to Itasca and Itasca's form bill of sale to investors, together with the following documents: 1. Non-Recourse Promissory Note 2. Recourse Note 3. Purchase Agreement 4. Security Agreement 5. Mortgage of Copyright 6. Assignment of Copyright
Weisel also included a copy of a draft "polished" standard form of appraisal signed by two appraisers and informed Stifelman that the copyright was not obtained until a buyer was found, at which time the copyright was put in the buyer's name. It was understood at their initial meeting that Weisel was having prepared two separate appraisals of the master sound recordings for sale. It is unclear why Weisel subsequently chose to use a single appraisal report signed *512 by two appraisers. Moreover, it is unclear whether the appraisal Stifelman received at that time referred to a specific master recording or was simply a form appraisal of classical master recordings in general. The record suggests the latter. A meeting in California was subsequently scheduled for July 28, 1977. In preparation for this meeting, Stifelman obtained a form record purchase agreement from some of his acquaintances to serve as a checklist of the business issues and legal issues to be included in the purchase agreement with Itasca. Stifelman also arranged for the California firm of Kadison, Pfaelzer, Woodard, Quinn and Rossi to review the documents. Stifelman had no background in music or in the recording industry and had never had any dealings with the recording industry aside from this transaction. Stifelman read Itasca's Confidential Record Memorandum prior to his meeting with Weisel on July 28, 1977. Stifelman and Weisel discussed various provisions in the proposed purchase and sale agreement and the proposed distribution agreement with Festival. Various changes were made to these agreements as reflected by the Purchase and Sale Agreement and Distribution Agreement *513 subsequently executed by petitioner. Stifelman also discussed with Weisel the possibility of obtaining an opinion letter from the law firm representing Itasca regarding the validity of Itasca's title to the master recordings. Stifelman was concerned with proving that valid title to the master recordings purchased from Itasca would pass to his clients. There was no negotiation in regard to the price of a master recording. Stifelman also visited Festival and spoke with Mr. Collins, one of the stockholders of Festival. Stifelman's purpose in visiting Festival was to satisfy himself that Festival existed and was an actual business and that the people seemed to know what they were doing. Stifelman has never inspected the books and records of Festival and has no visited the premises of Festival since July 28, 1977. Stifelman also met with Mr. Siner, one of the appraisers who signed the form appraisal for the master sound recordings. [5] Stifelman knew that Siner was being compensated by Itasca for consulting with him. In 1976 Siner had prepared appraisals for records promoted by another one of Weisel's companies, Golden Record Marketing Company. Prior to recommending the master *514 recording venture to his clients and petitioner, Stifelman did not consult with any appraiser other than Siner. [6]
When he met with Siner, Stifelman had a copy of the draft appraisal previously prepared by Siner. Stifelman understood that the appraisals for each of his clients would be addressed to a specific master but would utilize the same form as the draft appraisal. The appraisal was largely based upon a seven-year marketing plan described therein. Stifelman read the seven-year marketing plan described in the draft appraisal, but did not ask Siner or anyone else what kind of financial investment would be required to implement such a plan, or whether Festival had the resources to implement such a marketing plan. Altogether the negotiations and discussions with Weisel, the meeting with Siner, and the visit to the premises of Festival took a total of about nine hours. Stifelman's investigation *515 dealt primarily with the paperwork of the transaction rather than the economic viability or economic substance of the master recording investment. There was no attempt by Stifelman to negotiate a lower purchase price for petitioner. The next morning on July 29, 1977, Stifelman met with two lawyers from the law firm of Kadison, Pfaelzer, Woodard, Quinn and Rossi (Kadison law firm). That firm reviewed the documents, advised Stifelman on the effect of California law on the transactions contemplated, and discussed with Stifelman the "P" copyright for the recording and recommended that Stifelman obtained the opinion letter in regard to title that he had discussed with Weisel. Stifelman subsequently received an opinion letter, dated August 11, 1977, from the law firm of Hardee Barovick Konecky & Braun, and signed by Robert L. Oppenheim. That opinion letter indicated that the documentation represented by the agreement of sale from Transworld to Itasca dated March 15, 1977, and the bill of sale attached thereto and the affidavit dated January 4, 1977 from Elmar J. Seeger, Managing Director of Transworld, was sufficient to prove good title in Itasca. [7]
*516 After returning from California, Stifelman and Weisel continued to wrap up the loose ends of the proposed sales of the master recordings through the mail and by telephone. Weisel and Stifelman sent drafts and redrafts of the various documents back and forth. The Kadison law firm reviewed the various documents for Stifelman and made at least one substantive recommendation. The Kadison firm suggested that the last paragraph of the nonrecourse promissory note be revised to read as follows: It is understood and agreed that the security covered by such Security Agreement and the rights and remedies granted to the holder of this Note by the terms of such Security Agreement and this Note with respect to such security, shall be the sole recourse of holder in the event of default hereunder. It is further understood and agreed that there shall be no personal liability on the part of the maker hereof or any of its successors or assigns for the payment of any sum due and payable under this Note.
This language was incorporated verbatim in the nonrecourse promissory note executed by petitioner. After the documents pertaining to the proposed sales of the master recordings were drafted *517 in final form to the satisfaction of Stifelman and Weisel, Stifelman orchestrated sales of these master recordings for seven of his clients, one of whom was petitioner. [8] Six single disc master recordings were purchased for a stated purchase price of $ 150,000 each and one double disc master recording was purchased for a stated purchase price of $ 210,000, for a total stated investment of $ 1,110,000. Stifelman's law firm received a commission of $ 19,500 or 10 percent of the cash and recourse note investment on each master recording sought through Stifelman. All of Stifelman's clients, including petitioner, selected Festival as their record distributor. *518 At the time petitioner purchased his master recording he had no knowledge or training in music and had no experience in any facet of the recording industry. He also knew that Stifelman had no experience or expertise in this area. Petitioner had not previously invested in any venture involving the purchase, distribution or exploitation of a master recording. Petitioner was not involved in any of the negotiations preceding his acquisition of the master recording. Petitioner relied entirely on Stifelman's investigation with respect to this venture. Prior to acquiring the master recording, Stifelman discussed the tax consequences of this transaction with petitioner. Petitioner understood that he would be putting up $ 15,000 in cash in 1977 and receiving in return an investment tax credit of $ 15,000 and a depreciation deduction for 1977, which would more than offset the $ 15,000 investment so that he would actually be out of pocket the $ 15,000 for approximately six months. Petitioner also knew that his $ 15,000 cash investment in 1977 would virtually wipe out his tax liability for that year. He also knew that the depreciation deductions computed on $ 150,000 would greatly exceed *519 his $ 25,000 out-of-pocket investment ($ 15,000 cash and $ 10,000 recourse note). Petitioner also understood something about the possibility of recapture in regard to the nonrecourse liability of $ 125,000 at the end of 10 years. [9]
Petitioner read the Confidential Record Memorandum distributed by Itasca prior to entering into the transaction. Petitioner understood that the master recordings were only being sold to investors who had a net worth of at least $ 150,000, excluding residence, furnishings and personal automobiles, and had some portion of their annual income subject to the 50 percent or higher tax bracket. At trial, petitioner specifically recalled reading the risk factors in the Confidential *520 Record Memorandum describing the record business as highly speculative and involving a substantial degree of risk. Petitioner testified that he did not take the risk factors concerning the recording industry "literally." Due to his experience in the securities area, petitioner considered the risk factors described in the Confidential Record Memorandum as much an insurance policy for the promoter as dispositive of any particular fact. However, neither petitioner nor Stifelman made any attempt to investigate the accuracy of those representations. Petitioner also understood that according to Itasca's computations in the Confidential Record Memorandum, a minimum of 93,000 copies of each record would have to be sold for an investor to recoup his cash investment and a minimum of 900,000 copies of each record would have to be sold for the investor to pay off the nonrecourse note. These minimum levels of sales were above the industry norms. Petitioner had no idea of the industry norm for classical records and had no discussion with Stifelman or anyone else about the industry norm for classical records. [10]
*521 Petitioner read Siner's draft appraisal, which had been provided to Stifelman, but petitioner could not recall whether the draft appraisal pertained to his or any other particular master recording. At the time he read the appraisal, petitioner had no knowledge of the extent, if any, of Siner's experience in classical music or in the classical music recording industry. In 1977 neither Weisel nor Siner had any prior experience in the classical music subsector of the industry. Prior to purchasing the master recording, petitioner did not seek advice or obtain an appraisal from any appraiser (other than Siner) and, aside from Stifelman's limited investigation, never consulted with any industry person or expert regarding his master recording. Petitioner selected his master recording from a list of eight or ten classical master recordings. He decided to buy Beethoven's Symphony No. 3, the last Beethoven symphony left on the list, because he felt that a Beethoven symphony would be more marketable and more interesting to people than some of the other classical pieces left on the list. On September 20, 1977, by Purchase and Sale Agreement made as of September 7, 1977, petitioner acquired *522 from Itasca the master sound recording titled "Ludwig Van Beethoven - Symphony #3 op. 55, E-Sharp-Major Eroica" (sic) for the total stated purchase price of $ 150,000. Pursuant to the terms of the agreement, petitioner paid $ 15,000 of the purchase price in cash and executed a recourse note in the amount of $ 10,000 payable on or before January 3, 1978, and a nonrecourse promissory note in the amount of $ 125,000 payable on or before December 31, 1987. Petitioner paid the recourse promissory note by check dated January 3, 1978, in the amount of $ 10,233.33 representing interest and principal. [11]
*523 The nonrecourse promissory note in the amount of $ 125,000 stated that it had accrued interest at the rate of 7 percent per annum with principal and interest to be paid on or before December 31, 1987. This note was secured by the Security Agreement and Copyright Mortgage executed by petitioner on September 7, 1977, and was payable only from proceeds derived by petitioner from the sale of records. Petitioner was only required to make prepayments of interest and principal on this nonrecourse note in accordance with paragraph 5 of the Purchase and Sale Agreement as follows: From sums derived by Buyer from the distribution of the records, prepayments on the Non-Recourse Note shall be payable as follows: (a) Of the first $ 29,000 of sums received, Buyer shall pay fifteen percent (15%) in part prepayment of the Non-Recourse Note, the same to be applied first to interest and then to principal. (b) Of the sums in excess of the first $ 29,000, Buyer shall pay fifty percent (50%) in part prepayment of the Non-Recourse Note until the principal and interest thereof are paid in full. the [sic] said prepayments to be applied first to interest and then to principal. (c) Buyer authorizes *524 any record distributor to deduct the sums described in (a) and (b) above from sums due Buyer under any record distribution agreement and to pay such deducted sums directly to Seller. (d) Buyer shall use its best efforts to cause the distributor to furnish Seller with copies of all accounting statements at such times as said statements are required to be furnished to Buyer.
No principal or interest payments have been made by petitioner on the nonrecourse note. [12] Moreover, aside from the initial cash payment and the payment on the recourse note, petitioner has never issued any checks or made any payments for any expenses in connection with the exploitation of his master recording. Petitioner also entered into a distribution agreement with Festival on September 20, 1977, for the distribution of his master recording. *525 Petitioner did not meet with or contact any other potential distributors before deciding to use Festival. The distribution agreement was for a seven-year term; however, petitioner had the right to terminate the agreement on ten days' written notice at anytime after one year from the date of execution. As of the date of trial, petitioner had not terminated his distribution agreement with Festival, although Festival developed financial problems in 1978 and had become moribund by 1980. The distribution agreement with Festival provided in pertinent part as follows: 4. FESTIVAL will use its best offorts to release such LP delivered it to in the United States within sixty (60) days from the delivery of all tapes, artwork and permissions required, if any, by FESTIVAL in connection with such release. FESTIVAL agrees to manufacture and distribute at least two thousand five hundred (2,500) copies of the LP (including DJ copies, "freebies" and bonus LP's). * * * 8. All phonograph records solely embodying the master recording subject to this Agreement released by FESTIVAL during the term hereof shall bear the copyright in the name of OWNER. OWNER warrants and represents that it owns *526 said copyright. FESTIVAL will indicate on the label of each record the fact that it is copywritten by OWNER. 9. FESTIVAL agrees that it shall advertise and distribute the master recording released by FESTIVAL hereunder through appropriate outlets. FESTIVAL shall consult with OWNER in respect of advertising and marketing plans for the master recording. However, the manner in which said distribution shall be done is within FESTIVAL's sole discretion. FESTIVAL shall have the right to assign distribution rights or make a subdistribution agreement. FESTIVAL shall have the right to edit these masters and recompile or couple them with masters owned by others. In the event of recompilation or coupling, OWNER shall receive a pro-rata royalty. 10. FESTIVAL will pay to OWNER for the rights granted herein: (a) On United States full-line retail sales, a royalty of $ 1.00 per record sold and paid for; (b) On United States budget-line retail sales, a royalty of $ .25 per record sold and paid for; (c) For United States trade-cut marketing: (1) A royalty of Fifty Cents ($ .50) on all records (LP's) and pre-recorded tapes derived from master recordings subject hereto manufactured *527 and sold in the United States through retail outlets and not returned; (2) A royalty of Ninety-Nine Cents ($ .99) on all records (LP's) and pre-recorded tapes, derived from master recordings subject hereto, manufactured and sold in the United States through mail order outlets and not returned; (d) Notwithstanding the foregoing, on records and tapes sold outside the United States or to be sold through sub-distributors or in special marketing and distribution media, FESTIVAL and OWNER agree to negotiate in good faith a royalty agreement; (e) FESTIVAL shall have the right to maintain reasonable reserves to provide for returns. In this connection, FESTIVAL shall at OWNER's request give OWNER's representative complete access to information concerning FESTIVAL's reserve at the close of any accounting period, together with the amount of inventory then on hand at FESTIVAL's branches and in pressing plants, as well as related sales information (the pattern of return authorizations as against reorders, etc.). If after review it appears that the reserve is excessive, FESTIVAL shall promptly advance to OWNER a sum fairly representing such access. (f) No royalties shall be paid to OWNER *528 for records (i) given away or sold at less than FESTIVAL's cost thereof, (ii) for promotional or advertising purposes; (iii) for records sold for scrap, overstock or as "cut-outs;" (iv) for records given away on a "no-charge" basis to distributors or dealers in connection with the sale of records subject hereto, or (v) for records sold to distributors or dealers, at less than fifty percent (50%) of the stated wholesale list price. 11. FESTIVAL will, within sixty (60) days after the expiration of each calendar quarter, render a statement of accrued royalties under this Agreement earned on an LP-by-LP basis during such preceding calendar quarter. FESTIVAL will pay to OWNER simultaneously with the rendering of such statement, the amount, if any, which may be due to OWNER over and above costs, payments and advances if any, deductible hereunder. Unless OWNER specifically objects, in writing, to any such statement or payment within one (1) year after receipt thereof, said statement or payment shall be deemed finally binding upon and accepted by OWNER. A Certified Public Accountant representing OWNER may examine FESTIVAL's books and records upon reasonable prior notice at reasonable *529 times during normal business hours at FESTIVAL's principal place of business as same pertain to the subject matter of this Agreement.
In addition, the distribution agreement required Festival to deduct from royalties otherwise payable to petitioner all sums due to Itasca on the nonrecourse note and all sums payable to Transworld pursuant to the Purchase and Sale Agreement between petitioner and Itasca. The distribution agreement with Festival failed to define "full-line retail sales" or "budget-line retail sales" for purposes of computing any royalties. On or about October 10, 1977, petitioner received the originals and/or copies of the various executed documents pertaining to the purchase of his master recording. Petitioner also received an appraisal report dated October 5, 1977, assessing the fair market value of his master recording as of March 31, 1977, at more than $ 150,000. [13] The appraisal report was produced by Entertainment Consultants Company, directed to Itasca and signed by Robert L. Siner and his associate, Richard Krizman. Entertainment Consultants Company was organized in late 1976 or early 1977 specifically to do appraisals for Golden Record Marketing Company, *530 one of Weisel's other companies. The company had two employees, Siner and Krizman. Siner was also the president of Entertainment Consultants Company. Siner and Krizman worked on the appraisal together but Siner actually wrote the appraisal. Krizman also had no experience in the classical music subsector of the recording industry. His experience was strictly in marketing and sales. At the time he worked with Siner on the appraisal, Krizman was employed with a trade publication called R&R, which had no involvement in the classical music subsector of the recording industry. While Siner had considerable experience in the recording industry in general, Siner's employment experience prior to 1977 did not involve classical music or the marketing of classical recordings. Moreover, Siner had never *531 budgeted or produced a classical recording. In fact, Siner had never appraised a classical master recording other than for Itasca and Golden Record Marketing, both of which were jointly owned by Weisel and Lasky. Weisel and Lasky were involved with numerous companies other than Itasca. Golden Record Marketing sold master recordings to various limited partnerships in which Lasky was one of the individual general partners or the sole general partner. These partnerships also had distributioon agreements with Festival. At the time Siner prepared the initial appraisal of the classical master recordings for Itasca, he was vice president of advertising and merchandising for MCA Records, Inc., division of MCA, Inc. During the years 1973 through 1977, MCA was not actively acquiring or producing classical recordings, although it had some classical records in its catalog that it acquired from mergers with other companies. In early 1979 MCA merged with ABC. Siner became president of MCA in 1979, and for a period of six to eight months MCA maintained a classical department consisting of one person who was a carryover from ABC. Siner, as president, then decided to terminate the classical *532 department due to budget and personnel cutbacks. Siner and Weisel began discussions concerning appraisals of the classical master recordings in late 1976 or early 1977. When Weisel retained Siner to prepare the appraisals, Siner did not receive copies of the various classical master recordings. At some point later in 1977, however, Siner received cassettes of some of the recordings but not the master recordings themselves. Prior to beginning his appraisal, Siner knew that Weisel wanted to charge approximately $ 150,000 for each single disc master recording. Siner prepared a draft form appraisal prior to July of 1977, which he gave to Weisel. The basic information contained in the draft form appraisal was used for all of the classical master recordings. In all, Siner prepared appraisals for between 18 and 25 master recordings for Itasca. Siner knew that these appraisals would be given to potential purchasers of the classical master recordings. Siner did not recall specifically all the appraisals he had prepared, but suggested that changes made with respect to each appraisal would not have been major. Indeed, Siner simply prepared one basic appraisal which was used for each *533 master recording by simply inserting the different titles of the master recordings sold by Itasca. [14]
The appraisal that petitioner received from Itasca in connection with the purchase of his master recording valued petitioner's master recording in excess of $ 150,000. [15] However, the record does not establish that Siner ever listened to petitioner's master recording prior to preparing *534 the appraisal, but presumably he listened to it before the trial. The only comparable classical recording that Siner used to compare with petitioner's master recording was a classical record that his daughter had checked out from school. Based on the royalty schedule in the distribution agreement with Festival, Siner projected the gross income potential of petitioner's master recording over a ten-year period at $ 500,000. He broke that figure down as follows: Budget Line Sales - 60,000 units at $ .25
$ 15,000
Retail sales - 100,000 albums - assume
retail program is only 25% effective -
25,000 units at $ 1.00
25,000
Mail order, foreign and all other
sources, 25,000 at $ .40
10,000
Gross annual income
$ 50,000
Gross income over ten years
$ 500,000
*535 The above computations reflect what Siner considered to be conservative projections derived from a seven-year marketing plan that he developed projecting annual sales of 360,000 records. This seven-year plan, in addition to using the existing retail distribution channels, contemplated innovative marketing techniques designed to reach the classical listeners who were not buying classical records. The underlying thrust of Siner's proposed marketing plan was geared at bringing the classical records directly to the consumer using direct mail and door-to-door sales. Siner envisioned civic groups or clubs, the PTA and other school organizations, the Boy Scouts and Girl Scouts, and other organizations selling classical records door-to-door earning royalties for their respective organizations. Siner also contemplated designing classical records with custom labels for particular groups of manufacturers as an alternative marketing technique, and also suggested that systems could be developed similar to that of Shaklee, Avon and Tupperware. Under his plan, Siner projected annual sales of 60,000 of classical records using the normal channel of distribution (retail outlets), another 100,000 *536 sales by mail order and 200,000 sales using the service club approach. Siner's sales estimates, either the 360,000 or the "conservative" 110,000 per year, were wholly unrealistic. Siner's seven-year marketing plan was not part of the distribution agreement between petitioner and Festival. Siner's seven-year marketing plan had never been proven successful by any company in the industry and has never been implemented. Moreover, at the time he prepared the appraisal, Siner had no idea of the total cost of implementing his proposed seven-year marketing plan. Siner was not familiar with Festival and knew nothing about its financial resources or ability to market classical recordings. The distribution agreement that petitioner entered into with Festival did not incorporate Siner's seven-year marketing plan, and Festival did not obligate itself to implement such a plan. However, at their meeting on July 28, 1977, Siner specifically told Stifelman that the marketing variables set forth in his appraisal would have to be undertaken to produce the value Siner had assigned to the master recording, in other words, that his valuation depended upon this marketing plan being carried out. *537 In a letter to petitioner dated October 11, 1977, Festival acknowledged receipt of the master recording of petitioner's Beethoven symphony and indicated that the record manufacturing was in progress. Festival was only obligated to manufacture 2,500 records. At some point petitioner received a royalty statement from Festival for the period ending November 30, 1977, that indicated that 1,000 units of petitioner's Beethoven's Symphony No. 3 had been sold and that petitioner was entitled to net royalties of $ 200. The royalty statement reflected gross royalties of $ 250 at the rate of $ .25 each, less $ 50 (20 percent) for a reserve for returns. Festival did not deduct from petitioner's royalties any amount to apply towards the nonrecourse note as specifically provided in the distribution agreement. Petitioner received a check from Festival dated December 28, 1977, in the amount of $ 200. This was the only income petitioner received from his master recording during any of the years in issue. On or about January 10, 1978, petitioner received ten copies of his Beethoven record album. The first time petitioner ever listened to the recording he had purchased was in January of 1978 *538 after receipt of those albums. On or about January 11, 1978, petitioner received for his signature a revised 1978 application for registration of a claim to copyright his master recording. A copyright of petitioner's master recording was registered with the United States Copyright office effective February 10, 1978. The copyright was registered in the name of Ralph Lowenbach c/o Calliope Records Inc. The registration fee was charged to the deposit account established by Calliope Records Inc., which was another of the many companies in which Weisel held an interest. Itasca paid $ 100 for the liner notes (comments on the back of the album cover) prepared for petitioner's master recording. Itasca also paid $ 452.40 in sales tax for color separating for various classical recordings and paid Festival a $ 20,000 advance to promote the various classical recordings. However, Itasca was not obligated by its agreement with petitioner to pay any promotional expenses for the distribution of his master recording. Petitioner was not obligated to pay and did not pay any promotional expenses. Also Festival was not obligated by its agreement with petitioner to spend any particular amount for *539 promotion of his record. By letter dated April 14, 1978 Festival informed petitioner that prior to delivery of the 1,000 record sale as reflected in the royalty statement submitted to petitioner in December of 1977, Festival decided to rescind the contract. Thus, petitioner was instructed to treat the $ 200 he had received in 1977 as an advance against royalties rather than actual royalties. [16]
The audit of petitioner's 1977 tax return commenced in late 1978. On or about March 2, 1979, petitioner received from Festival the following accounting based on accrued sales from his master recording for the period ending December 31, 1978: Sales [17]
Unit Price
Amount
100
$ .95
$ 95.00
529
1.00
529.00
Gross Amount
$ 624.00
Cost For Goods Sold (629 x $ .65)
408.85
Balance
$ 215.15
Festival Fee
(25%)
53.79
Net Due
$ 161.36
*540 On or about April 7, 1980, petitioner received from Festival the following accounting of the sales from his master recording for the period ending December 31, 1979: Sales
Unit Price
Amount
20 albums
$ .90
$ 18.00
6 cassettes
1.00
6.00
Gross amount
$ 24.00
Cost for Goods Sold (26 x $ .65)
16.90
Balance
$ 7.10
Festival Fee (25%)
1.78
Net Due
$ 5.32
Petitioner never received any payments in 1978 or 1979 from the sales generated in those years, because the net amounts were less than the advance royalties paid in 1977. By letter dated July 15, 1981, Weisel informed petitioner of a proposed agreement with Columbia Special Products division of CBS, Inc., to distribute petitioner's record as part of a line of budget classical records. Weisel also informed petitioner that selling off the existing Festival inventory of his product was a prerequisite of the deal with Columbia Special Products and that a bulk sale of his remaining inventory (1,170 units) had been recently negotiated at $ .55 per unit net, for a sum total of $ 643.50. [18] *541 On October 28, 1981, Weisel, on behalf of Encino Joint Venture Entertainment (Encino), a partnership between Weisel and Lasky, entered into an agreement with CSP, as of June 15, 1981, relating to the marketing of various classical recordings by CSP, including petitioner's master recording. [19] This agreement granted Columbia Special Products and the CBS Records Division of CBS, Inc., and its affiliates, subsidiaries and/or licensees the exclusive license to manufacture, advertise and sell records and tapes of approximately 36 classical master recordings, one of which belonged to petitioner. However, the agreement contained no release commitment and no records or tapes were ever distributed by CSP under this agreement. In fact, due to the poor quality of these master recordings, CSP made arrangements to license other classical master recordings for its classical catalog. Valuation of *542 Petitioner's Master Recording
Petitioner's master recording is a rendition of the Beethoven Symphony No. 3 in E Flat Major, Op. 55, performed by the "Wurttembergische Philharmonic." There is no orchestra of that name and this anonymous, fictitious orchestra is made up of unidentified musicians and an unidentified conductor. The master recording lasts justs under 45 minutes, the average length of a performance of this symphony varying from 44 to 50 minutes. [20] This master recording was produced in Western Europe by Transworld. Under the terms of the agreement between Itasca and Transworld, since Itasca had not purchased all of the first 200 master recordings made available, Transworld could re-record this master recording at anytime; the only limitation was that Transworld could not record or release recordings of any composition contained on the masters purchased by Itasca "under the name of the Orchestra ["Wurttembergische Philharmonic"] used by Itasca on its records made from the masters." The quality of the performance on petitioner's master recording is good, [21] but the recording itself is below the technical standard for that particular time period and appears dated in *543 its type of production. Generally, the market value of a classical recording depends on its sales potential rather than on the production or manufacturing costs. The single most important factor contributing to the success of a classical master recording is the performing artist. However, with a symphony orchestra, the conductor has the greatest impact on the potential sales of the recording. Thus, the main commercial flaw in petitioner's master recording affecting its marketability and diminishing its market value is the failure to provide a conductor credit, i.e., to name the conductor. [22] Even with a strong performance and a high quality recording, *544 it would be difficult to successfully market a classical recording in the absence of a conductor credit and with a fictitious orchestra. Marketing classical recordings is highly specialized and competitive, and such marketing people are very knowledgeable about their product. Sales of classical recordings account for only a small fraction of the overall sales in the recording industry. In 1977, total sales of records, tapes, etc., at suggested retail prices within the recording industry was approximately $ 3-1/2 billion dollars and classics had about 4-1/2 percent of that market or about $ 150 million dollars. Classical music is in the public domain and classical recordings are not unique of music such as one might find in popular music. Rather, recordings of the same symphony reflect various interpretations of the different artists and display certain quality factors that are either real or perceived on the part of the potential buyer. At the time petitioner purchased his master recording, numerous recordings of Beethoven's Symphony No. 3 were readily available to the *545 consumer. Schwann's Record and Tape Catalog, which is published monthly, contains a listing of all recordings in the active catalogs of record companies that are currently available. The Schwann Record and Tape Catalog is a necessary marketing tool in promoting a classical recording through retail outlets. It is the only catalog resource available to the public and the dealers often use it as a reference. Petitioner's recording was not listed in Schwann's during any of the years in issue. The Schwann Record and Tape Catalog contained at least 14 or 15 listings for Beethoven's Third Symphony. In addition, complete sets of Beethoven symphonies (including the Third Symphony) consisting of seven to eight albums were also listed and available for sale. Moreover, a number of classical recordings known as cut-outs or overruns that had been unloaded on the market as distress merchandise and not listed in the active catalogs of record companies were also available at that time. In fact, one of respondent's experts had at least 40 different recordings of Beethoven's Symphony No. 3 in his personal music library. Generally, classical recordings are released and marketed at varying price *546 levels. In 1977, suggested retail for full-price product (top-of-the-line) was between $ 6.98 and $ 7.98; suggested retail for budget-price product was between $ 3.98 and $ 4.98. Recordings also sold in between those levels at mid-line prices, and stated prices at all levels were frequently discounted in practice. The failure to provide a conductor credit essentially eliminated petitioner's recording from being marketed at either the full-price level or the mid-line price level. Moreover, even with a conductor credit, the technical flaws in petitioner's master recording, if not corrected, would also have reduced its marketability at those levels. Thus, the sales potential of petitioner's recording was essentially limited to the budget-price market. Budget-price classical recordings are distributed by major record companies and by specialty record companies. However, major companies generally do not record new material specifically to be released as a budget product. Usually, classical recordings released at budget prices by major companies are recordings that once had been released at a higher price and had outlived their commercial usefulness at that higher price, but still *547 had some value at a lower price. By that time, production costs of the stepped-down recordings had been either completely amortized or otherwise written off. Specialty companies, on the other hand, normally acquire classical recordings for budget release by license from other record companies. Two of the main independents that specialized in classical recordings in 1977 were Quintessence Records and Vox Records. Quintessence acquired its classical recordings by license. Generally, those licenses ran for five years with renewal options. In acquiring those licenses, Quintessence usually was required to pay advances against royalties ranging from a low of $ 500 to a high of $ 2,000. Quintessence had the clout of one of the largest marketing chains behind it. Its parent company, Pickwick International, was at that time the largest retailer of recordings, operating more than 400 retail outlets under the Musicland and Discount Records banners. Pickwick was also the largest rack jobber in the country with sales departments in literally thousands of department and discount stores, including Sears and Woolco. Pickwick was also a major wholesaler of recordings to other retailers. *548 Even with all of this established marketing support, an average sale for Quintessence of a good classical budget recording was in the area of 10,000 recordings per year, although certain records have generated annual sales of 30,000. Festival's plan for petitioner's recording was primarily geared to reaching the unsophisticated novice or first-time buyers of classical recordings. The name of the conductor on a classical record is important to such a novice buyer because the novice is more likely to be familiar with a well-known conductor than with the name of the symphony or other classical piece. In its January 1977 issue, Schwann offered five versions of the Beethoven Third Symphony at budget prices, all with named conductors. Annual sales of petitioner's recording at budget prices through normal retail channels with no conductor credit and a fictitious orchestra would fall considerably short of 10,000. For these same reasons, it would be difficult to generate any significant number of sales through mail order. In 1977, petitioner could have purchased or leased a master recording comparable to the one he purchased for far less than his stated purchase price of $ 150,000. He *549 could have had a master recording of Beethoven's Symphony No. 3 produced in the United States at union rates, and with a large (70-80 musicians) well-known orchestra and with a well-known conductor such as Leonard Bernstein, for $ 40,000 to $ 50,000. For approximately $ 2,000, he could have purchased in the United States or anywhere in Europe a master recording comparable to the one he purchased. He could have had a comparable master recording specially produced in Germany for $ 2,000 to $ 12,000 and in England for slightly more. He also could have obtained a license for a comparable master recording for $ 500 to $ 2,000. Itasca paid $ 3,000 for petitioner's master recording, which price was higher than the price of other comparable master recordings available in 1977. Based on realistic potential sales of his recording and the cost of other comparable master recordings, the fair market value of petitioner's master recording in 1977 was not in excess of $ 3,000. On a Schedule C, attached to his Federal income tax returns for each of the years in issue, petitioner claimed the following amounts of income and deduction from his master sound recording venture: 1977
1978
1979
1980
Gross Receipts
$ 250 $ -0-  $ -0-  $ -0-  Cost of Goods
Sold
-0-  -0-  -0-  -0-
Depreciation
21,429 36,735 26,239 18,742 Net Loss
($ 21,179)
($ 36,735)
[23] ($ 26,239)
($ 18,742)
*550 Petitioner computed his depreciation deduction using the double declining balance method, a seven-year useful life, and a cost basis of $ 150,000. Petitioner also claimed a tentative investment tax credit of $ 15,528 in 1977, which exceeded his computed tax of $ 12,518 for the year and $ 11,990 of which was attributable to the purchase of his master recording. Respondent determined that neither the depreciation deductions nor the investment tax credit claimed by petitioner attributable to his master sound recording are allowable, and accordingly has determined deficiencies for the years 1977 through 1980. ULTIMATE FINDINGS OF FACT 1. Petitioner did not have an actual and honest profit objective at the time he purchased his master sound recording. 2. The fair market value of his master sound recording in 1977 was not in excess of $ 3,000. OPINION The sole *551 issue in this case is whether petitioner is entitled to depreciation deductions and the investment tax credit in connection with acquiring his master recording. Resolution of this issue depends on whether petitioner entered into the activity with an actual and honest objective of making a profit. Section 167(a) [24] permits a depreciation deduction for a reasonable allowance for the exhaustion of (1) property used in a trade or business or (2) property held for the production of income. An activity does not constitute a trade or business unless the taxpayer engages in the activity for the predominant purpose and intention of making a profit. Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v Commissioner,78 T.C. 659, 698 (1982); Brannen v. Commissioner,78 T.C. 471, 505-506 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The same kind of profit-making objective is also a prerequisite for deductions under section 212(1) and (2). Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Jasionowski v. Commissioner,66 T.C. 312, 318-319 (1976), *552 and for the investment tax credit under section 38. Flowers v. Commissioner, supra, at 931 n. 24; Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Petitioner's profit expectation need not be reasonable, but he must have an actual and honest profit objective. Section 1.183-2(a), Income Tax Regs.; Beck v. Commissioner,85 T.C. 557, 569 (1985); Flowers v. Commissioner, supra,80 T.C. at 931; Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Allen v. Commissioner,72 T.C. 28, 33 (1979); Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), 379 F.2d 252 (2d Cir 1967). The issue is one of fact to be resolved on the basis of all of the surrounding circumstances. Beck v. Commissioner, supra,85 T.C. at 570; *553 Flowers v. Commissioner, supra,80 T.C. at 931-932; Lemmen v. Commissioner, supra,77 T.C. at 1340; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Petitioner has the burden of proving the requisite profit objective. Rule 142(a); Beck v. Commissioner, supra,85 T.C. at 570; Flowers v. Commissioner, supra,80 T.C. at 932; Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In making this factual determination, we give greater weight to objective factors than to the taxpayer's mere statement of his intent. Section 1.183-2(a), Income Tax Regs.; [25]Beck v. Commissioner, supra,85 T.C. at 570; Flowers v. Commissioner, supra,80 T.C. at 932; Siegel v. Commissioner, supra,78 T.C. at 699; Churchman v. Commissioner,68 T.C. 696, 701 (1977). *554 Although Section 183 is actually an allowance provision rather than a disallowance provision, allowing limited deductions for nonprofit-making activities, Brannen v. Commissioner, supra,78 T.C. at 500, the inquiry into the taxpayer's profit-making objective is the same. Accordingly, the factors listed in section 1.183-2(b), Income Tax Regs., provide a useful framework for resolving this factual issue. See n. 25, supra; Beck v. Commissioner, supra,85 T.C. at 569-570; Flowers v. Commissioner, supra,80 T.C. at 931-932; Brannen v. Commissioner, supra;Siegel v. Commissioner, supra,78 T.C. at 699; Wildman v. Commissioner,78 T.C. 943, 953-954 (1982). Based on our consideration of all the facts and circumstances, we conclude that petitioner did not engage in his master recording activity with an actual and honest objective of making a profit. Therefore, petitioner is not entitled to an investment tax credit regarding the master recording activity and deductions for depreciation attributable to such activity are allowable only to the limited extent permitted by section 183(b). [26] *555 *556 Petitioner's conduct prior to his purchase of the master recording does not indicate a profit objective. Petitioner was not involved in any of the negotiations preceding his acquisition of the master recording and relied entirely on Stifelman to investigate the venture, and to negotiate the terms of the purchase agreement and the distribution agreement. Petitioner had no experience in any facet of the recording industry, and he also knew that Stifelman did not have any experience or expertise in this area. Indeed, by his own admission, Stifelman had no background in music or in the recording industry, and had never had any previous dealings with the recording industry. In 1977 neither Weisel, the promoter, nor Siner, the seller's appraiser, had any experience in the classical music subsector of the industry. Nevertheless, neither petitioner nor Stifelman consulted with any independent experts regarding the distribution of master recordings, or specifically regarding the profit potential of the particular classical master recording that petitioner purchased. The Confidential Record Memorandum distributed by Itasca repeatedly warned that the record business was highly speculative *557 and involved a substantial degree of risk. Petitioner chose to ignore those warnings, treating them as just something to protect the promoter. Moreover, the Confidential Record Memorandum specifically warned potential purchasers that the minimum number of sales required to recover the down payment of $ 25,000 and the minimum of sales required to pay off the nonrecourse loan were in excess of the industry norm. See n. 10, supra. Furthermore, if petitioner or Stifelman had seriously considered the nontax merits of this investment, it is improbable that they would have blindly relied on the appraisal furnished by the seller, particularly in view of the cautionary language in the Confidential Record Memorandum. See Beck v. Commissioner, supra,85 T.C. at 572; Elliott v. Commissioner,84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). Had petitioner or Stifelman made even a minimal independent investigation of the representations made by Itasca in its Confidential Record Memorandum and the projected sales of the master recording based on a seven-year marketing plan as described in Siner's appraisal, *558 they would have discovered that the projected sales of his classical master recording were totally unrealistic and unattainable. Petitioner argues that the fact that Stifelman, his principal advisor/attorney, investigated, negotiated, and then followed up on the transactions with Itasca and the distributor Festival is persuasive evidence of petitioner's profit motive. Petitioner contends that Stifelman performed the necessary "due diligence" investigation to satisfy himself and petitioner that the investment in the master recording had real economic potential. We disagree. At trial and on brief there were frequent references to Stifelman's "due diligence" investigation, a term apparently applicable to the securities field but not determinative of the issues of this case. See Estate of Canfield v. Commissioner,T.C. Memo. 1987-294. This Court cannot on this record and need not determine whether Stifelman's investigation satisfied whatever duty, if any, he may have had under rules and regulations of the Securities and Exchange Commission (SEC) or the National Association of Securities Dealers (NASD). We do not know if Stifelman served as a private finder or as *559 a NASD licensed broker-dealer in this master recording transaction. In any event, those matters are not determinative of any issue before this Court. We merely note that Stifelman performed a competent job as a lawyer, see n. 8, supra, but lawyers are not "all-purpose experts." Stifelman is not an economist and he has no experience or expertise in music or in the recording industry. Stifelman's "due diligence" investigation was geared solely to the legal paperwork to try to insure the tax benefits of the transaction. See n.8, supra. There was no investigation as to the economics of the transaction. Stifelman traveled to California in July of 1977 and visited the premises of the proposed distributor, Festival, met with Siner, the seller's appraiser, and met with Weisel, the promoter of the master recording, all in about a nine-hour period. By his own admission, Stifelman visited Festival to satisfy himself that Festival was in existence and was an actual business and to determine whether the people seemed to know what they were doing. See Flowers v. Commissioner,80 T.C. 914, 934 (1983). However, Stifelman did no inspect the books and records of Festival *560 and did not inquire whether Festival had the financial resources to distribute the master recordings according to the seven-year plan set forth in Siner's appraisal. Although Stifelman had read Siner's appraisal depicting the seven-year marketing plan, Stifelman did not ask Siner or anyone else what kind of financial investment it would take to implement such a plan or whether Festival had the resources to implement such a plan. In sum, the record discloses that Stifelman's meeting with Siner was superficial at best and no attempt was made to elicit from Siner, or to seek from an independent industry expert, the information necessary to make a reasonably informed decision as to the economic substance of the transaction. Similarly, petitioner's contention that Stifelman and Weisel conducted serious negotiations on bona fide business aspects of the deal is also not persuasive. Stifelman and Weisel discussed various provisions of the proposed purchase agreement and the proposed distribution agreement, and various changes were made to these agreements. However, a review of the changes made in these agreements reflects that the changes were merely formalistic and cosmetic, and did *561 not enhance or further the profitability potential of the deal. The principal change was to strengthen the nonrecourse terms of the nonrecourse promissory note. We are convinced that the correspondence back and forth between Stifelman and Weisel served no purpose other than to paper the file to try to insure the tax benefits of the transaction. Stifelman also retained a Los Angeles law firm for advice on the impact of the master recording, issues of title to the master recording, and to review the documents as they were negotiated. Stifelman also requested and received an opinion letter from Itasca's legal counsel to the effect that Itasca had good title to the master recording sold to petitioner. These steps taken by Stifelman were routine legal procedures that any attorney worth his salt would have taken to insure the legalities of any purchase and sale transaction. More importantly, neither petitioner nor Stifelman ever attempted to negotiate (with Weisel) a lower purchase price for the master recording. [27] In addition, prior to entering into the distribution agreement with Festival, neither petitioner nor Stifelman investigated the possibility of using a different distributor. *562 While several changes were made to the proposed distribution agreement with Festival, similar to the changes made to the purchase agreement with Itasca, these changes did not relate to the overall profitability of the transaction. Both petitioner and Stifelman read Siner's draft appraisal prior to petitioner's entering into the transaction. The appraised value of the master recording was based on implementing a seven-year marketing plan described in the draft appraisal. However, the distribution agreement did not obligate Festival to use the marketing plan as described in the appraisal. Under the agreement Festival was obligated to distribute the master recording, but the manner of distribution was left to Festival's soled discretion. In addition, although the agreement provides that Festival "shall advertise" the master *563 recording, the agreement does not specifically obligate Festival to expend any amount on advertising. Also telling of petitioner's lack of profit motive is the fact that under the agreement Festival was specifically obligated to manufacture and distribute only "2,500 copies of the LP (including DJ copies, 'freebies' and bonus LP's)." However, the Confidential Record Memorandum, which petitioner said he had read, projected a minimum of 93,000 record sales needed to recoup his $ 25,000 cash investment and a minimum of 900,000 record sales needed to pay off the $ 125,000 nonrecourse note. Petitioner also did not listen to the master recording of Beethoven's Third Symphony before buying it and did not consult with any industry expert regarding his selection. Rather, petitioner selected his master recording from a list of eight or ten master recordings and selected the Beethoven Symphony No. 3, the only Beethoven symphony left on the list, because he felt that a Beethoven symphony would be more marketable and more interesting to people than some of the other classical pieces on the list. Neither petitioner nor Stifelman ever investigated to see how many recordings of Beethoven's Third *564 Symphony were already available to the consumers; some 14 or 15 other recordings are already listed in the Schwann Record and Tape Catalog that was published monthly. Petitioner's conduct after his purchase of the master recording is also indicative of a lack of profit objective. Petitioner did not maintain a separate bank account for this activity. Moreover, Festival did not provide petitioner the periodic statements as required under the distribution agreement and petitioner did nothing to enforce compliance. In addition, petitioner first began writing letters to Weisel during the end of 1978 regarding the lack of performance of Festival. This was after the Internal Revenue Service had begun an audit of his 1977 tax return. While the record contains several letters written by petitioner and letters received by petitioner regarding his master recording, we are satisfied that these letters represent petitioner's efforts to paper the file for the appearance of a profit objective, particularly after the audit began. Petitioner never sought out a different distributor for his master recording and as of the date of trial had not terminated his distribution agreement with Festival, *565 although Festival encountered financial difficulties in 1978 and had become moribund by 1980. Petitioner's use of a large nonrecourse note also indicates the lack of an actual and honest profit objective because the note was contingent, illusory, and without any real economic substance.[28] The nonrecourse note was payable solely from proceeds of any record sales. The Confidential Record Memorandum specifically stated that a minimum of 900,000 copies of the record must be sold to pay off this nonrecourse loan and that level of sales was in excess of industry norms. On numerous occasions we have stated that "the existence of large nonrecourse notes in circumstances where it is unlikely that the notes will be paid is itself an indication that the primary objective of an activity is to generate tax deductions rather than to earn an economic profit." Seaman v. Commissioner,84 T.C. 564, 596 (1985). See Estate of Baron v. Commissioner,83 T.C. 542, 556 (1984), affd. 798 F.2d 65 (2d Cir. 1986). In addition, when an asset is purchased using nonrecourse financing, *566 whether the fair market value of the asset approximated its purchase price is a factor to be considered in determining the necessary profit objective of the taxpayer. Beck v. Commissioner,85 T.C. 557, 577 (1985), and the cases cited therein. We have found that the fair market value of petitioner's master recording when he acquired it in 1977 was not in excess of $ 3,000, the same amount Itasca had just paid Transworld for the master recording. This figure is slightly higher than the greater of the values determined by respondent's experts, whom we found to be very well qualified, competent and persuasive. However, this figure is considerably less than petitioner's cash investment of $ 25,000. Although petitioner's expert, Siner, valued the master recording at more than $ 150,000, we reject his opinion as without factual basis and vastly inflated. In 1977 petitioner could have had a master recording of Beethoven's Third Symphony produced in the United States, at union rates and with a large, well-known orchestra and a well-known conductor such as Leonard Bernstein, for $ 40,000 to $ 50,000. While Siner had experience in the recording industry, his experience *567 was in popular music and prior to 1977 he was not involved in the marketing of classical recordings. In addition, Siner has never budgeted or produced a classical recording. It is unclear whether Siner actually listened to petitioner's master recording prior to preparing his appraisal. In fact, the record shows that Siner prepared one form appraisal relating to classical recordings in general, and this same appraisal was used for the 18 to 25 master recordings for which he supplied appraisals. Siner merely made minor and insignificant changes to conform with the specific master recording. Siner's appraisal was made up of vague generalities and shocking inaccuracies that revealed his lack of knowledge of classical music in general and of the recording of classical music in particular. See nn. 14, 20, supra. Siner also did not take into account the serious commercial flaws in petitioner's master recording including the absence of a conductor credit. Rather, Siner valued the master recording based on projected sales using a seven-year marketing plan. However, this seven-year plan had never been previously proven successful by any record distributor. Moreover, prior to preparing *568 his appraisal Siner knew that Weisel wanted to sell the single disc master recordings for around $ 150,000. We are satisfied that Siner's 1977 appraisal and his expert report for the trial (which are essentially identical) do not accurately represent the fair market value of petitioner's master recording. Siner's projection of sales for petitioner's master recording is wholly unrealistic and unattainable. Siner's appraisal represents nothing more than a "pie-in-the-sky" valuation concocted to support Itasca's predetermined sales price of $ 150,000, which was 50 times more than Itasca had just paid for the master recording. Thus, we have given no weight to Siner's valuation. By contrast, each of respondent's experts had extensive experience in classical music and in the classical recording industry and each provided specific, detailed factual testimony regarding the realistic sales potential of petitioner's master recording. Based on the testimony and the reports of respondent's experts, we are satisfied that in 1977 petitioner's master recording had a fair market value not in excess of $ 3,000. While petitioner's cash out-of-pocket is considerably more than the fair market value *569 we have determined, the Court is satisfied that the excess of the cash investment over the fair market value represented the purchase price for the purported tax benefits associated with the activity. We are also not persuaded by petitioner's argument tha the losses petitioner sustained were due to "unforeseen or fortuitous circumstances" beyond his control such as "depressed market conditions," which he claims seriously hampered Festival's efforts to commercially exploit the master recording. First, except for Weisel's vague and generalized testimony, there is little evidence indicating the effort Festival made to commercially exploit petitioner's master recording. While Weisel testified that Festival expended between $ 300,000 to $ 400,000 to promote its classical catalog that included petitioner's master recording, there is absolutely nothing in the record to corroborate his testimony. Moreover, we have given little weight to the alleged downturn in the recording industry subsequent to petitioner's acquisition of the master recording. We note that this coincided with the very period when petitioner's expert, Siner, became president of MCA and turned that company from a loss to *570 a profit. We are satisfied that no record distribution company, even in a strong market, could have attained the level of sales for petitioner's master recording necessary for petitioner to have the opportunity to make a profit. Petitioner argues that the proper measuring point in evaluating whether he had an opportunity to make a profit is his cash investment of $ 25,000, and not the total purchase price of $ 150,000, citing Wildman v. Commissioner,78 T.C. 943 (1982), and Bizub v. Commissioner,T.C. Memo. 1983-280. Petitioner points out that under the terms of the purchase agreement with Itasca, he was entitled to keep 85 percent of the first $ 29,000 of proceeds received, and 50 percent of the proceeds in excess of $ 29,000. Thus, petitioner contends he would have recovered his $ 25,000 cash investment after the recording had generated just $ 29,700 in sales. ($ 29,000 x 85% + $ 700 x 50% = $ 25,000.) After any combination of retail and mail order sales totaled (approximately) $ 29,700, petitioner contends that he would begin receiving a profit on his investment because he was to receive from Festival $ 1.00 for each record sold at retail and *571 $ .99 for each mail order sale. We need not belabor whether that is the proper measuring point in terms of evaluating profit objective, and we think it is not. [29] In any event, petitioner's argument is based on generating 29,700 record sales at full-line retail prices, in which event he received $ 1.00 per record. In our findings, we indicated that the commercial flaws in petitioner's master recording, most notably the lack of a conductor credit, precluded it from real contention at that price level. Moreover, the evidence establishes that even at budget sale prices petitioner's master recording would not generate sales of 29,700 records. Indeed, we found that higher quality classical recordings distributed at budget prices by well-known and established companies would rarely generate that kind of volume and the average was considerably less. In any event, at budget prices, in which event petitioner received $ .25 per record, petitioner's master recording would have to generate 100,000 sales just to recoup his cash investment. Such volume for this recording by a fictitious orchestra and an unidentified conductor is simply unrealistic and unattainable. *572 In conclusion, we hold that petitioner failed to satisfy his burden of proving that he engaged in the master recording activity with an actual and honest objective of making a profit. [30]
To reflect the concessions and our holdings, Decisions will be entered under Rule 155.
Footnotes
1. Respondent's deficiency determination for 1978 included an alternative position based on a "burnout" adjustment and an investment tax credit recapture regarding the acquisition of the master sound recording, both of which he conceded prior to trial. Petitioners conceded and paid the tax attributable to certain other miscellaneous adjustments, which are unrelated to the master sound recording activity. The deficiencies still in dispute for all the years in issue involve claimed deduction and credits from the acquisition of the master sound recording in 1977. Thus, our resolution of the issues as to the 1977 master sound recording transaction will dispose of all four years. ↩
2. Schedules 1 and 2 of the agreement were missing from the copy of the agreement that the parties submitted with their stipulation of facts, and those schedules have not been made part of the evidentiary record in this case. ↩
3. There is nothing in the record to indicate that Transworld perfected its security interest in the master sound recordings sold to Itasca. However, the record shows that Itasca paid the amount due on the nonrecourse note for petitioner's master recording at some point between January of 1978 and April of 1978. ↩
4. Itasca purchased only 35 or 36 of the masters made available. ↩
5. Stifelman did not meet the other appraiser, Mr. Krizman, until April of 1983. ↩
6. Siner and Weisel agreed that Siner would receive $ 7,500 for the initial data and appraisal report of the classical recordings. However, Siner testified that he had received only $ 800 for his appraisals. ↩
7. The affidavit attached to the opinion letter was a German-to-English translation of an affidavit from Transworld Music Establishment. It is unclear who provided the translation, but in any event neither Weisel nor Stifelman could read German. The translation of that affidavit acknowledged Transworld as the producer of the master recordings and that no indebtedness existed against any of the recordings. It also warranted that the masters had never been previously sold or licensed. The Court makes no finding based upon that affidavit and makes no finding as to good title vel non. ↩
8. The paperwork in this transaction is of a much better quality than the Court frequently sees in such master recording transactions. For the two most recent master recording cases, see McCain v. Commissioner,T.C. Memo. 1987-285, and Secoy v. Commissioner,T.C. Memo. 1987-286. For a compilation of master recording cases decided by this Court, see footnote 8 in the Secoy↩ opinion. However, while the legal paperwork in the instant case is carefully done, Stifelman's investigation as to the economic viability or economic substance of this master sound recording transaction is another matter. In that respect this case does not differ substantially from the other master recording cases. 9. Petitioner's understanding of the future tax consequences and the economics, if any, of this transaction was somewhat vague and confusing. Petitioner testified that he never thought of this transaction in terms of economic risk but rather in terms of $ 25,000 cash gone, less whatever tax benefits he derived over 10 years plus recapture on the $ 125,000 nonrecourse note in 10 years if the venture was unsuccessful. Petitioner stated that he never quantified these computations. ↩
10. Petitioner testified that he did not recall reading in the Confidential Record Memorandum that the minimum levels of sales needed to recoup the cash investment and to pay off the nonrecourse note were above industry norms. This statement appears in the last sentence of the paragraph entitled "RISKS OF THE RECORD BUSINESS" and again as the last sentence of the paragraph entitled "DISTRIBUTION NOT NECESSARILY PROFITABLE." ↩
11. In connection with the acquisition of the Beethoven master recording, petitioner received from Itasca a document entitled "Assignment of Copyright" and a document entitled "Bill of Sale," both dated September 20, 1977. Itasca received from petitioner a document entitled "Security Agreement" and a document entitled "Mortgage of Copyright," both dated September 7, 1977. The acquisition of the Beethoven symphony was formalized through the mail, which accounts for the discrepancies in the parties' execution dates. Petitioner executed the documents on September 7, 1977, mailed them to Itasca, and Itasca executed the documents on September 20, 1977. ↩
12. The parties stipulated that petitioner has made no payments of interest or principal on the nonrecourse note. However, at trial petitioner suggested that possibly $ 40 or $ 50 was applied to the nonrecourse note in 1981, a taxable year not in issue herein. However, the Court will not disregard a stipulated fact based upon such vague, unsupported testimony. ↩
13. Stifelman testified that the final appraisal dated October 5, 1977, was almost exactly the same as the draft form appraisal he had received prior to his meeting in July of 1977 with Weisel and Siner. However, the record does not establish that the draft form appraisal he saw in July pertained to petitioner's particular master recording or indeed to any particular master recording. ↩
14. There are numerous obvious errors in Siner's appraisal for petitioner and his expert report for the trial (which are essentially identical). These errors reflect a woeful lack of knowledge of classical music in general and of producing and recording classical music in particular. There is an error in the title of Beethoven's Third Symphony (described as E Sharp Major rather than E Flat Major). Leonard Bernstein is erroneously described as a foreign-born conductor. Many items of recording expense listed by Siner pertain to popular music but are not applicable in recording classical music. And the sales figures projected by Siner are wholly unrealistic when compared to actual results obtained by Quintessence Records with its well-established distribution system for classical recordings. ↩
15. The appraisal placed a replacement value of petitioner's master recording at $ 158,852. The replacement value was put in the appraisal purportedly as a guideline as to the cost of duplicating the master in the United States in case it was destroyed. Siner received the various costs he used for replacement value from the staff of MCA but never independently verified any of the figures. The actual cost of producing a comparable master recording in the United States was considerably less than that depicted by Siner. ↩
16. We rather doubt that any records were even manufacted in 1977. Petitioner did not receive copies of his record until Jannuary of 1978, and the alleged contract to sell 1,000 records in the latter part of 1977 was not produced at trial. Except for Weisel's testimony, which we found to be vague and confusing on this point, there is nothing in the record to indicate that any records were actually manufactured or sold in 1977. ↩
17. It is unclear whether the sales consisted of record albums, cassettes, or both.↩
18. The record shows that 1,116 units were sold at $ .50 per unit for a total of $ 558. ↩
19. According to Weisel, Encino was used essentially as an agent for the numerous owners of the classical master recordings because CSP did not want to deal individually with the 34 or 35 owners.↩
20. Siner's expert report gave the length of this master recording as 35 minutes, but Beethoven's Symphony No. 3 could not be compacted into 35 minutes. Also Siner gave the same playing period for Beethoven's Ninth Symphony which is much longer than the Third. ↩
21. The performance represents the musical direction and the musical conception of the conductor and the ability of the orchestra to perform and capture that conception. A good recording will be a good representation of the conductor's concept of the performance. ↩
22. This is not a situation of a little known or a virtually unknown conductor, but of no name at all. ↩
23. On the same Schedule C attached to his joint return for 1979, petitioner reported income and deductions for his oil and gas venture as well as his master recording venture. The claimed depreciation and the ensuing net loss attributable to the master recording venture was $ 26,239 which respondent disallowed.↩
24. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
25. Section 1.183-2(b), Income Tax Regs.↩, lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. 26. Section 183(b) provides in pertinent part: In the case of an activity not engaged in for profit * * *, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). We note that petitioner reported income of $ 250 in 1977 in connection with his master recording activity. No income was reported from this activity during any other years in issue. On Schedule C attached to his 1977 tax return (Form 1040), petitioner reported income of $ 250 and claimed a deduction for depreciation in the amount of $ 21,429 resulting in a net loss off $ 21,179. In his statutory notice of deficiency for 1977, respondent disallowed the net loss of $ 21,179 and increased petitioner's income accordingly. Respondent allowed petitioner a depreciation deduction in the amount of $ 250 to offset the amount of gross income derived from his master recording activity in 1977. Thus, petitioner is not entitled to any additional deductions regarding his master recording activity during any of the years in issue. On Schedule A attached to his 1978 return, petitioner claimed as an itemized deduction the $ 233 of interst paid to Itasca on the recourse promissory note in January of 1978. Respondent has allowed this deduction. That his master sound recording transaction lacks economic substance and was not entered into with a profit objective does not preclude petitioner from claiming a deduction under section 163 for any interest actually paid on a genuine recourse indebtedness. See Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 96 (4th Cir. 1985), revg. on this issue 81 T.C. 184 (1983), and Rose v. Commissioner,88 T.C. 386, 423↩ (1987). 27. Since this was a leveraged sale with a $ 125,000 nonrecourse note payable solely from the proceeds of any record sales and the purported tax benefits to be derived therefrom were based on the total purchase price, it would not have been to petitioner's tax advantage to acquire the master recording at a lower price if his cash investment remained the same. ↩
28. See Seely v. Commissioner,T.C. Memo. 1986-216↩. 29. See Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65↩ (2d Cir. 1986). 30. Our analysis is based upon the fact that this case was tried and briefed by the parties in terms of the presence of a profit objective under section 183 and the regulations thereof. We recognize that our recent opinion in Rose v. Commissioner,88 T.C. 386 (1987), adopts a test of economic substance in the category of "generic" tax shelters. Our conclusion under that test would be the same. See Taube v. Commissioner,88 T.C. 464 (1987); Leger v. Commissioner,T.C. Memo. 1987-146; Vandenhoff v. Commissioner,T.C. Memo. 1987-116↩.