LLOYD ANDERSON AND TERUKO ANDERSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent Anderson v. Commissioner
Docket Nos. 9394-88, 11494-88, 18355-89
United States Tax Court
T.C. Memo 1992-102; 1992 Tax Ct. Memo LEXIS 101; 63 T.C.M. (CCH) 2131; T.C.M. (RIA) 92102; February 19, 1992, Filed *101 Decisions will be entered for respondent in docket No. 9394-88 and docket No. 18355-89. Decision will be entered under Rule 155 in docket No. 11494-88. Laura K. Kail, for petitioners. Joyce M. Marr, for respondent. WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: In his notice of deficiency, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Lloyd Anderson and Teruko Anderson
Docket No. 9394-88 Additions to Tax and Increased Interest
Sec.
Sec.
Sec.
Sec. Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6621(c)
6661
1983
$ 9,205
$ 460
[2]
$ 2,762
[4]
[5]
1984
3,891
415
[3]
1,167
[4]
[5]
Ellis Hays and Pamela Hays Docket No. 11494-88 Additions to Tax and Increased Interest
Sec.
Sec.
Sec.
Sec. Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6621(c)
6661
1982
$ 13,677
$ 684
[6]
$ 4,103
[9]
[10]
1983
7,925
396
[7]
2,378
[9]
[10]
1984
6,850
343
[8]
2,055
[9]
[10]
*102 Ellis R. Hays and Pamela G. Hays Docket No. 18355-89 Additions to Tax and Increased Interest
Sec. Sec.
Sec.
Sec. Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6621(c)
1979
$ 1,364
$ 68
- -
[12]
1980
2,271
114
- -
[12]
1981
973
- $ 49
[11]
-
The issues for decision are: (1) Whether petitioners are entitled to deductions and investment tax credit arising out of a transaction involving the purchase of audio master cassette recordings. We hold that petitioners are not entitled to deductions and credits arising out of the *103 audio master cassette recording transaction. (2) Whether petitioners are liable for the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a), [13](a)(1) and (2). We hold that petitioners are liable for the section 6653(a) additions to tax. (3) Whether petitioners are liable for a valuation overstatement addition to tax pursuant to section 6659. We hold that petitioners are liable for additions to tax for overstating the value of the audio master cassette recordings. (4) Whether interest should be computed pursuant to section 6621(c), formerly 6621(d), for substantial underpayments attributable to tax-motivated transactions. We hold that interest should be computed pursuant to section 6621(c). (5) If section 6659 is inapplicable, whether petitioners are liable for an addition to tax attributable *104 to substantial understatements of income tax under section 6661. We hold that section 6659 is applicable to the instant case so that petitioners are not liable for additions to tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein. Background of the Master Audio Cassette Recording Transaction
G. West Munz (Munz), a certified public accountant, first produced an audio tape on the subject of accounting in 1979. Soon thereafter, Munz attempted to promote and sell audio master cassette recordings (master recordings) to investors. Munz was the scriptwriter and narrator for each of the master recordings. Munz valued each master recording at $ 60,000. Munz did not seek an independent appraisal for any of the master recordings at issue in this case. Munz had no experience in determining the fair market value of such recordings. The cost of producing the master recordings is indeterminable from the record in this case. Munz reviewed five or six master recording tax shelter programs in attempt to determine the fair market value of the tapes he planned *105 to market. Munz also estimated the value of the master recordings by considering sales projections for the tapes. He did not provide any evidence as to how he arrived at the estimated sales projections for the tapes. In determining the value of the master recordings and the potential tax benefits of his program, Munz relied heavily on a tax shelter program known as American Educational Leasing (AEL). The AEL master recording lease program involved a tax shelter that this Court held lacked economic substance in McCrary v. Commissioner, 92 T.C. 827 (1989), and Apperson v. Commissioner, T.C. Memo. 1987-571, affd. without published opinion 908 F.2d 975 (7th Cir. 1990). Like the AEL master recording program, Munz' program involved recruiting investors to acquire rights in a master recording for instructional tapes. In the instant case, petitioners reported a sizeable investment tax credit in the initial year of investment and depreciation expense deductions for the years at issue. Munz prepared and presented profit projections to petitioners. The profit projection emphasized the tax aspects of the program as it described the *106 availability of an investment tax credit along with depreciation and interest expense deductions. The cassette tapes sold at prices ranging from $ 2.50 to $ 8.95. The profit projection estimated the average sales price at $ 6 per cassette tape. Munz estimated the investor's profit per cassette sold to be $ 1.50 in the profit projection, and $ 1.85 in a document entitled "Breakdown of Selling Price". In connection with the purported sales of the master recordings, Munz prepared promissory notes to be signed by petitioners. The promissory notes apparently were due 10 years from the date of the initial investment. After the notes were paid in full, petitioners would own the master recordings outright. After petitioners made the initial payment for the master recordings, it was anticipated that the balance on the notes would be repaid from the profits of cassette tape sales. Munz did not perform a credit check on petitioners before accepting promissory notes for the balance due on the sale of the master recordings. Munz retained possession of the master recordings that he purportedly sold to petitioners. Munz was responsible for marketing the instructional tapes and was to receive *107 a 25-percent royalty from sales of the tapes reproduced from the master recordings. The master recordings were never copyrighted. Neither Munz nor petitioners produced any documents executed by the parties evidencing their alleged purchase of the master recordings. Petitioners did not produce any promissory notes, canceled checks, contracts, or agreements regarding the alleged purchase of the master recordings from Munz. Lloyd And Teruko Anderson
At the time of filing their petition, Lloyd and Teruko Anderson resided in Garden Grove, California. Lloyd Anderson (Anderson) was active in the marketing of Amway products during the early eighties. Through his Amway activities, Anderson became acquainted with Munz. Munz prepared the Andersons' Federal income tax returns for taxable years 1981 through 1984. During 1983, Munz informed Anderson of the opportunity to invest in the master recording program. Anderson entered an agreement to purchase the master recording entitled "You and the IRS". The agreement provided that the cost of the master recording totaled $ 60,000. Before entering the agreement, Anderson did not seek to have the master recording appraised and did *108 not ask Munz to provide an independent appraisal of such recording. Anderson did not receive any independent information from which it could be concluded that the master recording had a value of $ 60,000. Anderson did not negotiate the price or any of the terms provided for in the agreement. Anderson paid Munz $ 2,250 in 1983, and $ 2,250 in 1984 for the master recording. Anderson anticipated paying the $ 55,500 balance purportedly due with funds generated from the tape sales until the balance was paid in full. From the time Anderson invested in the master recording until the time of trial, he was not required to make a payment towards the $ 55,500 balance other than from profits from the sale of the tapes. Anderson did not have a written distribution agreement relating to the marketing of tapes to be reproduced from the master recording. Anderson did not know what the cost of marketing the tapes reproduced from the master recording would be on a per tape basis. Anderson did not explore alternate methods of distributing the tapes other than the methods utilized by Munz. Munz retained possession of the master recording and was entitled to do so until the note was paid in full. *109 Anderson was unaware as to whether the master recording "You and the IRS" had a copyright. For taxable year 1983, the Andersons reported no income from the master recording and claimed a $ 12,837 depreciation expense deduction. In addition, they claimed an investment tax credit of $ 5,500 in connection with the alleged purchase of the master recording. For taxable year 1984, the Andersons reported income of $ 315 from the master recording program and claimed a depreciation expense deduction of $ 11,495. In respondent's notice of deficiency, he disallowed the Schedule C losses claimed by the Andersons in 1983 and 1984, and disallowed the investment tax credit claimed by the Andersons in 1983. Ellis And Pamela Hays
At the time of filing their petition, Ellis and Pamela Hays resided in Long Beach, California. During the years in issue, Ellis Hays (Hays) was a professor in the department of speech communication at Long Beach State, and was also active in the marketing of Amway products. Hays entered into a business arrangement with Munz to acquire rights to a master recording entitled "Bookkeeping for the Home Based Business". Munz and Hays agreed that the price of the master *110 recording would be $ 120,000 since Hays was acquiring the "extra double long" version master recording and an instructional booklet along with it. Hays did not negotiate the price of the master recording and agreed to the $ 120,000 sales price determined solely by Munz. Hays did not obtain an independent appraisal of the master recording and did not ask Munz to provide him with an appraisal. Hays did not receive any independent information from which it could be concluded that the master recording had a value of $ 120,000. Hays was aware that the master recording "Bookkeeping for the Home Based Business" had not been copyrighted. The amount paid to Munz by Hays for the acquisition of the master recording is uncertain. The unpaid balance of the note payable to Munz is also uncertain. The Hayses did not produce any canceled checks, promissory notes, receipts, agreements, prospectuses, offering documents, or other memoranda that would evidence the purchase of or payment for the master recording. In addition, the Hayses stipulated that they were unable to locate or produce the master recording allegedly purchased by them and that they believe the master recording no longer exists. *111 Hays testified that he was "not very much interested in making money out of the tapes", and was primarily concerned with informing his Amway salespersons of the benefits disclosed in the tapes. For taxable years 1982 through 1984, the net profit reported by Hays from his Amway activities was minimal. During the years at issue, Hays had no control over the price charged for tapes reproduced from the master recording. Hays did not know how much of the sales price charged for each tape represented profit and how much represented the costs of reproducing, marketing, packaging, or other costs. Hays received no accountings as to how much the principal balance of his note was reduced by Munz' applying profits from the sale of any tapes to such balance. Munz prepared the Hayses' Federal income tax returns for taxable years 1982 and 1984. For taxable year 1982, the Hayses claimed a Schedule C loss of $ 18,000 from the master recording program. For 1982, the Hayses reported no income from the master recording activity and an $ 18,000 depreciation expense deduction. The Hayses also claimed a tentative regular investment tax credit of $ 12,000 relating to the purchase of the master recording. *112 Of the $ 12,000 of investment tax credit, $ 6,556 was utilized in 1982, and $ 4,608 was carried back to 1979, 1980, and 1981. The balance of the investment tax credit was carried forward to taxable year 1983. For taxable year 1983, the Hayses reported income of $ 48 from the master recording and claimed a depreciation expense deduction of $ 26,400. The resulting loss of $ 26,352 was reported on Schedule C. For taxable year 1984, the Hayses reported income of $ 514 from the master recording and claimed a depreciation expense deduction and interest deduction in the respective amounts of $ 25,200 and $ 3,514. The resulting loss reported on Schedule C totaled $ 28,200. In his notice of deficiency, respondent disallowed the Schedule C losses claimed by the Hayses in connection with the master recording activity for the taxable years 1982, 1983, and 1984. Respondent further disallowed the investment tax credit claimed in connection with the master recording in 1982, including the investment tax credit carryforward to 1983. Respondent similarly disallowed the investment tax credit carrybacks from 1982 to 1979, 1980, and 1981. OPINION Petitioners contend that the purchase of the *113 master recording was a transaction entered into for the production of income. Respondent argues that petitioners' master recording transactions lacked economic substance and petitioners did not have an actual and honest profit objective. Respondent further contends that petitioners failed to establish that they acquired a depreciable interest in the master recordings and therefore were not entitled to depreciation expense deductions or an investment tax credit. Petitioners are entitled to the deductions claimed for depreciation only if the master recordings were used in a trade or business, or were held for the production of income. Sec. 167(a). An investment tax credit is allowable only if the master recordings are depreciable. Sec. 48(a)(1). Property is used in a trade or business or held for the production of income only if the taxpayer has an actual and honest profit objective. Hirsch v. Commissioner, 315 F.2d 731 (9th Cir. 1963); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Section 183(a) provides the general rule that if an individual's activity is not *114 engaged in for profit, no deduction attributable to such activity will be allowed except as otherwise provided in that section. In determining petitioners' profit objective, we note that profit means economic profit, independent of tax savings. Surloff v. Commissioner, 81 T.C. 210, 232-233 (1983). While there need not be a reasonable expectation of profit, the profit objective must be bona fide. Fox v. Commissioner, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984). Profit objective is a fact to be determined from all the facts and circumstances. Independent Electric Supply v. Commissioner, 781 F.2d 724 (9th Cir. 1986). Greater weight is given to objective facts than to the taxpayer's mere statements of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of relevant factors, which are in large part a synthesis of prior case law, to be considered in determining whether an activity is engaged in for profit. Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). *115 These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.
Manner In Which The Taxpayer Carries On The Activity
Petitioners concede that they did not engage in activity which would constitute a trade or business. Instead, petitioners claim that they invested in a business to be operated by Munz and they therefore incurred expenses in connection with an *116 activity engaged in for the production of income. The objective facts surrounding petitioners' role in the master recording activity are supportive of respondent's position. Petitioners' investigation of the master recording activity promoted by Munz was quite cursory in nature. Munz did not provide an appraisal of the fair market value of any of the master recordings. Petitioners did not request Munz to provide them with any evidence in support of the fair market values assigned to the master recordings by Munz. Moreover, petitioners did not independently investigate the value of the master recordings or have an appraisal completed to verify Munz' estimate. The cost of producing the master recordings is uncertain, and petitioners produced virtually no evidence to support the value assigned to the master recordings on their income tax returns. Petitioners did not negotiate the price or the terms of the purported purchase of the master recordings. Petitioners relied on the representations made by Munz although Munz had little or no marketing expertise. Petitioners had no experience in the marketing of audio master cassette recordings. Munz provided petitioners with a profit *117 projection statement which focused primarily on the tax benefits of the master recording activity. The profit projection described the investment tax credit and the depreciation and interest deductions available for investors in the master recordings. It is uncertain as to whether master recordings ever existed as neither Munz nor petitioners produced the master recordings at trial. In addition, neither Munz nor petitioners produced the promissory notes evidencing the amount owed for the balance of the purchase price of the master recordings. After the initial payment for the master recordings, petitioners intended to pay the balance of the promissory notes from the sale of tapes reproduced from the master recordings. However, petitioners never received an accounting detailing the amount of sales and the amounts by which their note balances were reduced. If petitioners were truly concerned about the balances due on the promissory notes and the profitability of their investment, they certainly would have requested a detailed accounting in order to gauge the progress of their investment. Although petitioners attempted to portray an actual and honest profit objective, the objective *118 facts consistently convince us otherwise. Petitioners did not produce any written agreement or provide any oral testimony showing that Munz was restricted from selling the same master recording to hundreds of investors and thereby reducing the value of each master recording sold. All of the foregoing factors indicate that the master recording activity was operated in an unbusinesslike fashion and petitioners had little concern for the profitability of such activity. The Expertise Of The Taxpayer Or His Advisors
Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit objective where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs.
Petitioners had no expertise in the marketing of instructional tapes and did not attempt to obtain such expertise. There is no evidence that petitioners sought to determine whether Munz was qualified to produce and market the instructional tapes. Instead, they relied on Munz to operate the master recording activity and control the marketing *119 of tapes to be reproduced from the master recordings. Munz had no prior experience in producing and marketing instructional tapes on a large scale. Moreover, Munz' study involving the master recording activity focused on the evaluation of other tax shelter programs such as AEL. There is little or no evidence that he consulted experts or gained expertise with respect to the marketing of audio cassette recordings. Time And Effort Expended By The Taxpayer In Carrying On The Activity
Petitioners concede that they did not carry on a trade or business. They only assert that they acquired a master recording from which Munz would reproduce tapes to be sold to the public. Therefore, petitioners' activity in the reproduction and marketing of the tapes was virtually nonexistent. Furthermore, the record of this case indicates that Munz spent most of his time and effort promoting the sale of the master recordings to investors in order for them to achieve significant tax benefits, instead of marketing the instructional tapes to the public. Munz testified that he reviewed five or six other tax shelter programs in an effort to structure his own program. Munz also prepared petitioners' *120 Federal income tax returns. The time and effort expended by Munz to market the tapes to the public was insignificant. Neither Munz nor petitioners produced any documentation disclosing the sales volume of the instructional tapes. Expectation That Assets Used In The Activity May Appreciate In Value
The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with appreciation of land will exceed expenses of operation. Sec. 1.183-2(b)(4), Income Tax Regs.
Neither petitioners nor Munz obtained an independent appraisal to determine the value of the master recording. In addition, no market study was conducted to determine the potential sales volume of tapes reproduced from the master recordings. Petitioners introduced no testimony or documentary evidence indicating that they expected the master recordings to appreciate in value. *121 The Success Of The Taxpayer In Carrying On Other Similar Or Dissimilar Activities
The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs.
Neither petitioners nor Munz had any significant experience in marketing instructional tapes. As a certified public accountant, Munz did have experience in income tax return preparation. This only indicates that Munz had acquired knowledge relating to the subject matter of the instructional tapes. There is little or no evidence that Munz had any expertise in appraising the value of a master recording, producing, or marketing the tapes reproduced from the master recordings. Petitioners presented no evidence showing that Munz had engaged in similar activities in the past and converted such activities from unprofitable to profitable enterprises. The Taxpayer's History Of Income Or Losses With Respect To The Activity
A series of losses during the initial or startup stage of an activity may not necessarily *122 be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may indicate that the activity is not being engaged in for profit. A series of years in which net income is realized would be strong evidence that the activity is engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.
In 1983, the Andersons reported no gross receipts from the master recording activity and claimed a $ 12,837 depreciation expense deduction. In 1984, the Andersons reported gross receipts of $ 315 and claimed a depreciation expense deduction of $ 11,495. Thus, the Andersons reported Schedule C losses in 1983 and 1984 in the amounts of $ 12,837 and $ 11,180, respectively. In 1985, the Andersons were advised that their losses may be improper, at which time they discontinued reporting the purported losses. At no time did the Andersons report any net income from the master recording activity. For taxable years 1982 through 1984, the Hayses reported gross receipts of $ *123 0, $ 48, and $ 514, respectively. Their corresponding depreciation expense deductions for the same years were $ 18,000, $ 26,400, and $ 25,200, respectively. In 1984, the Hayses also claimed a $ 3,514 interest expense deduction relating to the master recording activity. Thus, the Hayses reported Schedule C losses for 1982 through 1984 of $ 18,000, $ 26,352, and $ 28,200, respectively. In 1985, the Hayses discontinued reporting losses from the master recording activity after being advised that the losses were improper. At no time did the Hayses report any net income from the master recording activity. Petitioners never realized an economic profit from the activity and introduced no evidence that continued losses are customary in entering into the business of marketing instructional tapes. The Amount Of Occasional Profits, If Any, Which Are Earned
The amount of profits in relation to the amount of losses incurred, and in relation to the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's objective. An occasional small profit from an activity generating large losses, or from an activity in which *124 the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. Sec. 1.183-2(b)(7), Income Tax Regs.
An opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioners made no profits and introduced no evidence showing an opportunity to earn a substantial ultimate profit. The Financial Status Of The Taxpayer
The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs.
Disregarding the master recording activity, the Andersons would have reported total income of $ 50,542 in 1983, and $ 47,309 in 1984. This indicates that the Andersons did not have to rely on the profitability of the master recording activity to finance their cost-of-living expenses. Indeed, the deductions and credit emanating from the master recording activity clearly provided tax benefits. *125 After deductions and the credit for 1983, the Andersons' tax liability was zero and they received a refund of $ 9,469. In 1984, the Andersons filed for a refund of $ 3,714. The Hayses similarly had income from sources other than the master recording activity. Disregarding the losses reported from the master recording activity, the Hayses had total income of $ 59,241, $ 64,461, and $ 65,001 for taxable years 1982 through 1984, respectively. Clearly, the Hayses did not have to rely on profits from the master recording activity to meet their costs of living. Moreover, the facts disclose that the tax losses and investment tax credit generated by the master recording activity provided significant tax benefits but no economic profits. For the years in issue, the Hayses received refunds of $ 10,075, $ 9,462, and $ 8,934. Elements Of Personal Pleasure Or Recreation
We find this element is inapplicable to the instant case. See sec. 1.183-2(b)(9), Income Tax Regs.
In conclusion, we find that every facet of petitioners' investment in the master recording indicates that petitioners were motivated by the supposed tax benefits of the transaction. Petitioners failed to produce copies *126 of the master recordings, the purported promissory notes, and any agreements, market studies, or appraisals. Overall, there is nothing to indicate that petitioners' objective was to realize a profit. In McCrary v. Commissioner, 92 T.C. 827 (1989), we analyzed a master recording program under the approach set forth in Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). In Rose, we stated that "While the subjective test is thus well founded in section 183, a unified approach emphasizing objective factors is preferable in cases involving generic tax shelters". Rose v. Commissioner, supra at 414. Rose enumerated the common characteristics of cases involving generic tax shelters as follows: (1) Tax benefits were the focus of the promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created *127 at relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. In cases having these characteristics, tax motivation is apparent. In the instant case, all of the characteristics of a generic tax shelter, as set forth in Rose, are present. Evidence in the record of a profit objective or business purpose is virtually nonexistent. The cases where we have rejected the contentions of taxpayers in master recording tax shelters are numerous. See McCrary v. Commissioner, supra; Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Morrow v. Commissioner, T.C. Memo. 1988-372; Avers v. Commissioner, T.C. Memo. 1988-176; Apperson v. Commissioner, T.C. Memo. 1987-571, affd. without published opinion 908 F.2d 975 (7th Cir. 1990); Lowenbach v. Commissioner, T.C. Memo. 1987-496; cases cited in Secoy v. Commissioner, T.C. Memo. 1987-286, n.8, affd. without published opinion *128 869 F.2d 1498 (9th Cir. 1989); Hawkins v. Commissioner, T.C. Memo. 1987-233. We see no necessity to repeat here an excruciating analysis of the factors set forth in Rose v. Commissioner, supra.
Proceedings in which the courts have repeatedly considered the same arguments by the taxpayers and rejected them entirely have led us to the point where we should simply state "that they are completely without merit" and should be dealt with "summarily and decisively * * * without engaging in scholarly discussion of the issues". See Derksen v. Commissioner, 84 T.C. 355, 357, 360 (1985) (quoting McCoy v. Commissioner, 76 T.C. 1027, 1029-1030 (1981), affd. 696 F.2d 1234 (9th Cir. 1983)). In Saviano v. Commissioner, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983), the Court of Appeals for the Seventh Circuit stated: The many elements of commercial surrealism present in these tax shelters should have put a reasonable person on notice that he was not being shown all the cards in the deck. It is unfortunate that in their haste *129 to obtain tax deductions taxpayers have put their common sense behind them and have become easy targets for tax shelter charlatans. * * * The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. * * *
In the instant case, we conclude that the master recording program lacked economic substance. Indeed, whether applying the test of section 183 or the generic tax shelter analysis in Rose, petitioners have not persuaded us that they entered into the master recording activity with the objective to make a profit. Therefore, we affirm respondent's determination disallowing the depreciation expense deductions and the investment credit claimed on the Andersons' 1983 and 1984 income tax returns. We also affirm respondent's disallowance of the depreciation expense deductions, investment credit, investment credit carryback and carryover, and interest *130 expense deduction relating to the Hayses' master recording activity. Based on the foregoing, it is unnecessary for us to decide whether petitioners ever acquired a depreciable interest in the master recordings. Additions To Tax Under Section 6653(a), (a)(1), and (a)(2)
Section 6653(a) and, beginning with taxable year 1981, section 6653(a)(1), provide for an addition to tax equal to 5 percent of any underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Beginning with taxable year 1981, section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest payable on the deficiency with respect to the portion of the underpayment which is attributable to negligence or intentional disregard of rules and regulations. Negligence under section 6653(a), (a)(1) and (2) is the lack of due care or the failure to act as a reasonable person would act under the same circumstances where there is a legal duty to act. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that no part of the underpayments for the years at issue is due to negligence or intentional *131 disregard of rules and regulations. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). Petitioners had no experience in the audio master recording industry and primarily relied on the advice of Munz, who held a financial stake in the transaction. Petitioners made only a cursory investigation, if any at all, of the master recording's value, the tax benefits promised, the alleged profit margins, and the market potential of the instructional tapes. Munz never provided petitioners with an independent appraisal of the master recordings, and petitioners failed to have an appraisal made. Petitioners never inquired into the past successes or failures of Munz in producing and marketing instructional tapes. Petitioners did not negotiate the price of the master recordings with Munz. Munz determined the price and the terms of the transaction. After entering into the transaction, petitioners paid little attention to their investment. Petitioners did not request or receive an accounting disclosing the profits from the instructional tape sales that should have been applied as an offset to the balance of their purported promissory notes. Through the master recording *132 transactions, petitioners were to receive immediate and long term tax benefits. The Andersons' tax benefits easily exceeded their out-of-pocket costs in the initial year of the investment. The investment tax credit, interest expense deduction, and depreciation expense deductions claimed by the Hayses resulted in significant tax benefits. The amount of their out-of-pocket costs is indeterminable since they failed to provide any documentary evidence as to the amounts paid to Munz for the purchase of the master recording. On the record before us, we conclude that "no reasonable person would have trusted this scheme to work". See Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. T.C. Memo. 1981-675. Obtaining such tax benefits, without any requirement of further effort, was patently too good to be true. Petitioners have failed to prove that they used due care or did what a reasonable and ordinary person would do under the circumstances. Therefore, respondent's determination regarding the additions to tax under section 6653(a), (a)(1), and (a)(2) is sustained. Addition To Tax For Valuation Overstatement Under Section 6659
*133 Section 6659(c) defines "valuation overstatement" to include the claim on a return of a value of 150 percent or more of the correct value. The amount of the addition equals the applicable percentage, as determined under section 6659(b), of the underpayment so attributable. Sec. 6659(a). If the claimed valuation exceeds 250 percent of the corrected value, then the addition to tax is equal to 30 percent of the underpayment attributable to the overstatement. Sec. 6659(b). Section 6659 does not apply if the underpayment attributable to the valuation overstatement is less than $ 1,000 for a taxable year. Sec. 6659(d). Because we have found that the transactions at issue lacked economic substance and are to be disregarded for tax purposes, petitioners have no "adjusted basis" for depreciation or investment tax credit purposes. See Rose v. Commissioner, supra at 426; Zirker v. Commissioner, 87 T.C. 970, 979-980 (1986); Apperson v Commissioner, supra. In the instant case, the values claimed on the tax returns, based on the exaggerated purchase prices claimed, far exceeded 250 percent of the corrected value, which *134 is zero. Thus, an addition to tax equal to 30 percent of the underpayment attributable to the valuation overstatement is appropriate. Sec. 6659(a) and (b). With respect to the Andersons, their entire underpayment was attributable to the overstatement of the adjusted basis utilized to calculate the investment tax credit and depreciation expense deduction claimed in 1983 and the depreciation expense deduction claimed in 1984. Therefore, respondent's determination of the section 6659 additions to tax against the Andersons is sustained. For the same reason, respondent's determination of additions to tax under section 6659 with regard to the Hayses is sustained for taxable years 1982 and 1983. However, in 1984 the entire underpayment was not attributable to a valuation overstatement. In 1984, the Hayses claimed an interest expense deduction of $ 3,514. The interest expense deduction was disallowed because the notes to which the interest related were part of a transaction that lacked economic substance. In addition, the Hayses did not offer any evidence to substantiate the claimed interest expense deductions. Therefore, we conclude that the part of the underpayment emanating from *135 the disallowed interest expense deduction is not attributable to a valuation overstatement within the meaning of section 6659. See Rose v. Commissioner, supra at 426; Zirker v. Commissioner, supra at 980. Of course, the section 6659 addition to tax attributable to the underpayment based on the depreciation expense deduction claimed by the Hayses in 1984 is sustained. Increased Interest Under Section 6621(c)
Section 6621(c), formerly section 6621(d), provides for an increased rate of interest where there is an underpayment of taxes in excess of $ 1,000 attributable to one or more enumerated "tax motivated transactions" in any year. Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into before the date of the enactment of 6621(c). Gantner v. Commissioner, 91 T.C. 713, 731 (1988), affd. 905 F.2d 241 (8th Cir. 1990); Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Tax-motivated transactions include valuation overstatements *136 within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). A tax-motivated transaction also includes "any sham or fraudulent transaction". Sec. 6621(c)(3)(A)(v). The language "any sham or fraudulent transaction" includes transactions where the taxpayer lacked a profit objective and which were without economic substance. Cherin v. Commissioner, 89 T.C. 986, 1000 (1987). Further, pursuant to section 301.6621-2T Q&A 4(1), Temporary Proced. and Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), any deduction disallowed under section 183 relating to an activity engaged in by an individual that was not for profit constitutes a tax-motivated transaction. See sec. 6621(c)(3)(B). In the instant case, the underpayments by the Andersons and the Hayses, to the extent they exceed $ 1,000 in a taxable year, are based on either valuation overstatements or transactions entered where they lacked a profit objective and which were without economic substance. Thus the entire underpayments at issue in this case are attributable to tax-motivated transactions. We therefore sustain respondent's application of the increased rate of interest under section 6621(c) *137 to the underpayments attributable to the tax-motivated transactions described herein. Because we have sustained the addition to tax under section 6659, it is unnecessary in this case for us to address the applicability of section 6661. See sec. 6661(b)(3). In accordance with the foregoing, Decisions will be entered for respondent in docket No. 9394-88 and docket No. 18355-89. Decision will be entered under Rule 155 in docket No. 11494-88. Footnotes
1. Cases of the following petitioners are consolidated herewith: Ellis Hays and Pamela Hays, docket No. 11494-88; Ellis R. Hays and Pamela G. Hays, docket No. 18355-89.↩
2. 50 percent of the interest due on $ 9,205.↩
4. To be determined.↩
5. In the alternative.↩
3. 50 percent of the interest due on $ 3,891.↩
6. 50 percent of the interest due on $ 13,677. ↩
9. To be determined. ↩
10. In the alternative.↩
7. 50 percent of the interest due on $ 7,925. ↩
8. 50 percent of the interest due on $ 6,850. ↩
12. To be determined.↩
11. 50 percent of the interest attributable to the underpayment. ↩
13. All section references are to the Internal Revenue Code of 1954 in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩